[No. B093693. Second Dist., Div. One. Dec. 12, 1996.]

NATIVE AMERICAN HERITAGE COMMISSION et al., Plaintiffs and Appellants, v.
BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY, Defendant and Respondent.

## COUNSEL

Carlos Holguin, Peter A. Schey, Carol A. Sobel, Mark D. Rosenbaum, Strumwasser & Woocher, Fredric D. Woocher, Michael J. Strumwasser, Susan L. Durbin and Raleigh H. Levine for Plaintiffs and Appellants.

Pete R. Navarro, Tzivia Schwartz, Gary, Cary, Ware & Freiderich, Charles Miller, Katten, Muchin, Zavis & Weitzman, Thomas J. Leanse and Deborah L. Fink as Amici Curiae on behalf of Plaintiffs and Appellants.

Nossaman, Guthner, Knox & Elliott, Howard F. Harrison, Gregory W. Sanders and James M. Picozzi for Defendant and Respondent.

## OPINION

**ORTEGA, Acting P. J.**—California State University, Long Beach (CSULB), a state governmental entity, decided to develop a 22-acre site on its campus. The California Native American Heritage Commission (NAHC), another state agency, and several individual Native Americans, filed this case under chapter 1.75 of the Public Resources Code seeking an injunction "to prevent severe and irreparable damage to, or assure appropriate access for Native Americans to, a Native American sanctified cemetery, place of worship, religious or ceremonial site, or sacred shrine located on public property." (§ 5097.94, subd. (g).)[1] The statutes creating NAHC authorize it to seek such relief to mitigate proposed development of state-owned land so the development will not irreparably damage, or prevent appropriate access to, the land for Native American religious worship. If no such mitigation is possible, and the public interest so requires, development can proceed.

In an earlier opinion, we modified and affirmed the trial court's issuance of a preliminary injunction. (*Board of Trustees* v. *Superior Court* (Feb. 24, 1994) B078402 [nonpub. opn.] (*NAHC I*).) We remanded the case for the trial court to hold a trial regarding issuance of a permanent injunction.

Before trial, however, the trial court granted CSULB summary judgment, and dismissed the case. The trial court accepted CSULB's claim that the statutes—authorizing the NAHC to ask courts to require appropriate mitigation of proposed development of state-owned land to prevent damaging the land's suitability or accessibility for Native American religious worship—facially violated the constitutional prohibitions against a state establishment

---

[1]Unless otherwise noted, all further section references are to the Public Resources Code.

of religion and use of public land to further religion. Plaintiffs appeal, arguing, among other things, that CSULB, as a state agency, lacks standing to assert such personal constitutional protections to challenge actions by another state agency regarding use of public resources. We agree with plaintiffs and reverse the judgment.

FACTS[2]

A. *Puvungna*

According to the verified complaint for injunctive relief, CSULB's approximately 319-acre campus is part of what was once Puvungna, a Native American village of about 500 acres. Puvungna was occupied by Native Americans "now known as the Gabrielinos (alternatively called Tongvans), Luisenos and Juanenos (alternatively called members of the Acagchemem Nation) . . . from . . . around 500 A.D.[] up to the early nineteenth century. The village Puvungna is among the sites the Gabrielinos inhabited until the early 1800s, when a combination of Spanish missionaries and American ranchers forced them out and nearly killed them off."

The complaint alleges Puvungna is the birthplace and spiritual center of the Chinigchinich religion, which the Gabrielinos originated. According to the complaint, many Gabrielinos, Juanenos, Luisenos and other Native Americans presently practice the Chinigchinich religion. "The Chinigchinich religion is named for the prophet, deity, spiritual leader and lawgiver Chinigchinich. Adherents believe Chinigchinich emerged at, and instructed his people from, Puvungna, the spiritual center of the Chinigchinich religion. Their faith teaches them that Puvungna, roughly translated as 'place of the great coming together,' was named for the huge gathering that took place there after the death of Wiyot, the supreme deity who, they believe, was one of the six original creations, along with the earth, rocks, trees, medicine plants, and animals. According to the tenets of the Chinigchinich faith, when Wiyot died, all of the other beings on earth grieved for him at Puvungna and awaited his return, which he had promised would occur in three days. Instead, Chinigchinich adherents believe, Chinigchinich emerged and created the Native American people in the physical form they have today."

---

[2]The facts are from the verified complaint (some of which were summarized in our earlier opinion), and other assertions made by the parties below and in their briefs. The trial court granted CSULB summary judgment because it found the statutes relied on by the plaintiffs facially unconstitutional. No trial on the permanent injunction was held, and no facts were adjudicated. To fairly represent the parties' positions, we include, without adopting, their factual assertions. We agree with plaintiffs that some of CSULB's factual assertions are based on discovery not considered by the trial court when it made the challenged ruling, but introduced during later motions. However, we deny plaintiffs' motion to strike this material.

In the Chinigchinich faith, "Puvungna is the most significant and sacred site there is, equivalent to Bethlehem for Christians and to Mecca for Muslims. Adherents of the tenets of the Chinigchinich sect, as well as adherents of the tenets of the Native American church as a whole, have long regarded Puvungna as a sacred place and have used the land for religious, spiritual and ceremonial purposes for centuries, up to and including the present time."

## B. *The 22-acre Site on CSULB*

The complaint further alleges that Puvungna has now been developed, except for vacant land contained within a 22-acre site on CSULB. The site allegedly "has become the de facto 'church' for the Chinigchinich adherents and other Native Americans who regard the land of Puvungna as sacred, because this plot of land is the only relatively undeveloped public land left of Puvungna still suitable for the religious ceremonies and rituals inherent to traditional Native American religions."

The site is "bounded by a drainage channel (Los Cerritos) to the north, Bellflower Boulevard to the west, Earl Warren Drive to the east, and the southern boundary of [CSULB] to the south, which boundary is just south of State University Drive." State University Drive bisects the southern end of the site, creating a smaller portion to the south and a larger portion to the north. The smaller portion to the south of State University Drive was nominated, accepted, and designated as LAn-234 by the National Register of Historic Places in 1974 because it was identified as part of Puvungna. Similarly, the larger portion to the north of State University Drive was nominated, accepted, and designated as LAn-235 by the National Register of Historic Places in 1974 because it was identified as part of Puvungna.

## C. *Development of LAn-234 and LAn-235*

LAn-234 and LAn-235 were nominated to the National Register of Historic Places by Dr. Keith A. Dixon, an archeologist who was then professor (now professor emeritus) of anthropology at CSULB. Before submitting those nominations, Dixon conducted at CSULB's request, an archeological survey of CSULB's entire campus. "That survey, described in a June 4, 1977, memorandum, uncovered archeological evidence that the campus was inhabited by Native Americans during a period from . . . [roughly 500 to 1000 A.D.] to the early 1800s. That evidence included 'midden deposits' (deposits of distinctively broken shells and stones and, sometimes, recognizable artifacts, all of which denote the presence of an archaeologically significant site inhabited by Native Americans), found in areas throughout

[CSULB]." Dixon nominated LAn-234 and LAn-235 as historic places because those sites were "the best representative of Puvungna, as they were the most clearly visible and best preserved of the archeological sites."

CSULB is not presently considering, to our knowledge, any development of LAn-234. CSULB has apparently set aside LAn-234 as a reburial ground for part of a skeleton exhumed from another site on LAn-235. The partial remains were removed from LAn-235 and examined before being reburied in a different location on LAn-234. The skeleton is allegedly that "of a Native American who had lived in prehistoric times [and] was found [on LAn-235] by workmen digging a trench. . . . About half of the skeleton was left in place [on LAn-235]. The other half was excavated and, in 1979, after a prolonged battle with [CSULB] over rightful possession of the remains, Native Americans reburied the excavated bones with appropriate religious ritual on [LAn-234]. At that time, [the Native Americans] were unaware that they were reburying only half of the remains [on LAn-234], and that the other half of the skeleton was still in the ground where it had been discovered [on Lan-235]." CSULB erected a wooden plaque on LAn-234 at the site of the reburial, "identifying the area as 'Puvungna, Birthplace of Chungichnish [a variant spelling of Chinigchinich], Lawgiver and God.'"

As for LAn-235, CSULB has been using portions of the site for a paved parking lot, an unpaved construction staging area for heavy machinery, a dumping area, a day-care center, an organic garden, and a Japanese garden. Regarding future development of LAn-235, CSULB has proposed building a temporary parking lot and minimall on the area where the organic garden is located.

In December 1992 CSULB submitted an initial study and negative declaration pursuant to the California Environmental Quality Act (§ 21000 et seq.) regarding the proposed parking lot on the organic garden site. The negative declaration disclosed the site was also designated on the campus master plan for a future shopping center or minimall.

CSULB disputes that the site is a Native American sanctified cemetery, place of worship, religious or ceremonial site, or sacred shrine. First, based on the individual plaintiffs' discovery responses, CSULB notes that the outer boundaries of Puvungna are imprecise, with estimates varying from Orange County to the south to central California to the north. CSULB concludes this undercuts the plaintiffs' claim that the disputed portion of its campus is Puvungna. However, all the plaintiffs' estimates of Puvungna's boundaries include the disputed section of CSULB's campus. Second, based on the

discovery responses, CSULB notes the individual plaintiffs practice their religion at other sites in addition to the disputed portion of the campus. CSULB thus concludes the disputed area is not "unique." However, one site may have much greater religious significance than another. CSULB also claims it plans to put faculty and student housing, as well as a mall, on the disputed site. CSULB claims this is an integral part of its operation of a university on the site. However, CSULB has yet to submit a specific, detailed development plan. Finally, CSULB argues the plaintiffs have repeatedly asserted no mitigation is possible. Perhaps, since CSULB has not proposed a specific plan, the plaintiffs' opposition may have taken this form. CSULB concludes this position essentially results in a permanent dedication of the disputed public land to plaintiffs for their religious use. Plaintiffs respond that even if they prevail, the effect is only to prevent a particular development plan from proceeding. CSULB would be free to later propose a different development plan. Moreover, a court would have to review *any* development plan, which could be halted only if the court agreed that no mitigation was possible. Even then development could proceed if the public interest warranted. However, because the trial has yet to be held, there is no record regarding the precise development proposal, possible mitigation, or whether the public interest warrants development absent mitigation.

As discussed more fully in our earlier opinion, the individual plaintiffs complained to the NAHC when CSULB indicated it planned to begin development of the disputed site in a way which would interfere with its religious use by plaintiffs. The NAHC is governed by section 5097 et seq. (See §§ 5097.91 ["There is in state government a Native American Heritage Commission, consisting of nine members appointed by the Governor with the advice and consent of the Senate."], 5097.92 ["At least five of the nine members shall be elders, traditional people, or spiritual leaders of California Native American tribes, nominated by Native American organizations, tribes, or groups within the state. The executive secretary of the commission shall be appointed by the Governor."].)

The NAHC is empowered to "prepare an inventory of Native American sacred places that are located on public lands and [to] review the current administrative and statutory protections accorded to such places." (§ 5097.96.) The NAHC is also authorized to investigate complaints regarding a proposed action by a public agency that may cause severe or irreparable damage to a Native American sacred place. Section 5097.97 provides: "In the event that any Native American organization, tribe, group, or individual advises the commission that a proposed action by a public agency may cause severe or irreparable damage to a Native American sanctified

cemetery, place of worship, religious or ceremonial site, or sacred shrine located on public property, or may bar appropriate access thereto by Native Americans, the commission shall conduct an investigation as to the effect of the proposed action. Where the commission finds, after a public hearing, that the proposed action would result in such damage or interference, the commission may recommend mitigation measures for consideration by the public agency proposing to take such action. If the public agency fails to accept the mitigation measures, and if the commission finds that the proposed action would do severe and irreparable damage to a Native American sanctified cemetery, place of worship, religious or ceremonial site, or sacred shrine located on public property, the commission may ask the Attorney General to take appropriate legal action pursuant to subdivision (g) of Section 5097.94."

Section 5097.94, subdivision (g) empowers the NAHC to "bring an action to prevent severe and irreparable damage to, or assure appropriate access for Native Americans to, a Native American sanctified cemetery, place of worship, religious or ceremonial site, or sacred shrine located on public property, pursuant to Section 5097.97. If the court finds that severe and irreparable damage will occur or that appropriate access will be denied, and appropriate mitigation measures are not available, it shall issue an injunction, unless it finds, on clear and convincing evidence, that the public interest and necessity require otherwise. The Attorney General shall represent the commission and the state in litigation concerning affairs of the commission, unless the Attorney General has determined to represent the agency against whom the commission's action is directed, in which case the commission shall be authorized to employ other counsel. In any action to enforce the provisions of this subdivision the commission shall introduce evidence showing that such cemetery, place, site, or shrine has been historically regarded as a sacred or sanctified place by Native American people and represents a place of unique historical and cultural significance to an Indian tribe or community."

The NAHC conducted its own investigation, including a series of hearings. Eventually, the NAHC concluded the disputed site qualified as a place of worship and that no mitigation was possible. The NAHC recommended that CSULB avoid all development of the disputed site. When CSULB indicated it would not avoid all such development, the plaintiffs filed this suit. The trial court issued a preliminary injunction, which we upheld, with modifications, in our earlier opinion. As discussed in the opening paragraph, before trial, the trial court granted CSULB summary judgment, finding the statutes authorizing the NAHC facially unconstitutional.

## DISCUSSION

■ The trial court adopted CSULB's contention that portions of sections 5097.9, 5097.94, and 5097.97 are unconstitutional because they "permit [the NAHC] to control the use of public property for religious purposes . . . ." CSULB argued these statutes violate: (1) the federal and state Constitutions' prohibitions against establishment of religion by allowing the NAHC to require the use of public property for a religious purpose; (2) the state Constitution's prohibition against preferring one religion over another by favoring Native American religion; and (3) the federal prohibition against excessive government entanglement with religion by requiring a state agency to determine which lands are sacred to Native Americans.

CSULB does not seriously dispute that, as a general rule, state agencies may not raise constitutional challenges to actions by other state agencies. (*Star-Kist Foods, Inc.* v. *County of Los Angeles* (1986) 42 Cal.3d 1, 5-9 [227 Cal.Rptr. 391, 719 P.2d 987] [although finding such standing on its facts].) While such standing has been conferred to vindicate structural rights, such as commerce clause and federalism disputes between state and federal governments, the general rule applies where, as here, the right is a first amendment right designed to protect individuals from government encroachment. In fact, California Constitution, article III, section 3.5, subdivision (a), prohibits an administrative agency from "declar[ing] a statute unenforceable, or refus-[ing] to enforce a statute, on the basis of it being unconstitutional unless an appellate court has made [such] a determination . . . ."

CSULB, however, argues it falls under three exceptions to the general rule: 1) its "student[s'] rights are inextricably bound up with this litigation and CSU[LB] was the only practical litigant"; 2) its "Board of Trustees . . . is expressly authorized by statute to bring suit on behalf of the students as trustee of the land"; and 3) its "Board of Trustees has standing pursuant to the oath taken by each individual trustee to defend the United States Constitution." (Some capitalization omitted.)

In our earlier opinion, we recognized the significance of the standing issue raised by plaintiffs. While we did not resolve it, finding only that the trial court did not abuse its discretion in not deciding the issue before issuing the preliminary injunction, we noted that "CSULB, a political subdivision of the state, has presented no showing of its standing to challenge state statutes on federal constitutional grounds. The issue of standing is far from settled, as noted by our Supreme Court in *Star-Kist Foods, Inc.* v. *County of Los Angeles*[, *supra*,] 42 Cal.3d 1. (See *Board of Supervisors* v. *McMahon*

[(1990)] 219 Cal.App.3d [286,] 296-297 [268 Cal.Rptr. 219].) CSULB's Board of Trustees is subject to full legislative control, and has 'only such autonomy as the Legislature has seen fit to bestow.' (*Slivkoff* v. *Board of Trustees* (1977) 69 Cal.App.3d 394, 401 [137 Cal.Rptr. 920].) 'This legislative control . . . is reflected in the well-established rule that subordinate political entities, as "creatures" of the state, may not challenge state action as violating the entities' rights under the due process or equal protection clauses of the Fourteenth Amendment or under the contract clause of the federal Constitution.' (*Star-Kist Foods, Inc.* v. *County of Los Angeles, supra,* 42 Cal.3d at p. 6.)

"Although the California Supreme Court noted the no standing 'rule's application beyond Fourteenth Amendment and contract clause challenges remains unsettled,' (*Star-Kist Foods, Inc.* v. *County of Los Angeles, supra,* 42 Cal.3d at p. 6), it pointed out that in '*City of South Lake Tahoe* v. *California Tahoe* (9th Cir. 1980) 625 F.2d 231, certiorari denied, 449 U.S. 1039 . . . (White, Marshall, JJ., dis.) the Ninth Circuit interpreted this "no standing" rule as absolutely barring political subdivisions from challenging state statutes on any federal constitutional ground. Regrettably, the *South Lake Tahoe* decision provides little guidance as to the court's reasoning in choosing a per se rule.' (*Id.* at p. 7.)" (*NAHC I, supra,* B078402.)

The general rule has been upheld, denying one governmental agency's constitutional challenge to another agency's acts, in *San Miguel Consolidated Fire Protection Dist.* v. *Davis* (1994) 25 Cal.App.4th 134, 143-145 [30 Cal.Rptr.2d 343] (although permitting individual taxpayer's challenges to proceed), and in *Board of Supervisors* v. *McMahon* (1990) 219 Cal.App.3d 286, 296-297 [268 Cal.Rptr. 219]. Two cases have permitted such challenges, but only because the courts found individuals who might be affected by the challenged acts of the other agency would lack notice of the challenged conduct or would otherwise be unable to assert their rights. (*Central Delta Water Agency* v. *State Water Resources Control Bd.* (1993) 17 Cal.App.4th 621, 630-631 [21 Cal.Rptr.2d 453]; *Selinger* v. *City Council* (1989) 216 Cal.App.3d 259, 270-271 [264 Cal.Rptr. 499].)

While CSULB argues that its students are unable to litigate their First Amendment rights, they provide no explanation why this is so. The mere fact that litigation may be costly does not itself prevent such litigation. Many individual students challenge government actions on First Amendment grounds in reported cases, perhaps due to the willingness of organizations to do so pro bono. Moreover, CSULB students presumably are members of a student association, funded by fees, and the association thus could assert

these rights. Indeed, the association appeared at the NAHC hearings and supported plaintiffs', not CSULB's, position. Thus, in this case, there is no bar to students asserting their constitutional challenges. CSULB also claims that if development is denied resulting in lost revenue, fewer students will be admitted in the future, and only CSULB can protect their rights. This argument is circular. First, it falsely assumes the only choice is between no development or complete development. Second, because no trial has been held we do not know how much (if any) revenue will be generated, because CSULB has not submitted a specific proposal. Thus, this argument is based on unproven assumptions.

Thus, this case is distinguishable from *Singleton* v. *Wulff* (1976) 428 U.S. 106, 113-118 [49 L.Ed.2d 826, 832-836, 96 S.Ct. 2868], in which a plurality of four justices found that doctors who were denied payment under federal regulations for non medically required abortions had standing to assert their patients' right to challenge the regulations. The plurality found the patients faced substantial hurdles in litigating their own interests, and that the doctors had such a close relationship to the patients that they could as effectively represent the patients' rights. Even assuming this passage in *Singleton* binds us, its factors of substantial hurdles to the third party litigating its interests and close relationship with the third party are absent here. Likewise, *Bender* v. *Willamsport Area School Dist.* (1986) 475 U.S. 534 [89 L.Ed.2d 501, 106 S.Ct. 1326], which conferred standing on a school board, but not its individual members, to challenge a court order overturning the board's refusal to permit a religious group to meet on campus during school hours, does not compel a different result. *Bender* assumed the *Singleton* factors, absent here, were present.

CSULB's second and third "exceptions" to the general rule likewise do not govern here. As we noted in our earlier opinion, the fact that the trustees are empowered by the state to manage the university's land does not give them any separate authority over it. The land is state land, and the state may choose to set it aside for a university or a Native American religious site. The trustees only administer the site because the state has delegated them to do so. CSULB argued the Legislature's establishment of the NAHC does not evidence a desire to balance the university's and Native American rights because the statutes require the NAHC to go to court to compel compliance if the administering state agency refuses to accept the proposed mitigations. On the contrary, the statutes reflect a desire for a careful balancing of those issues by a neutral court. CSULB also argues the mere fact that it is a defendant in the case somehow gives it standing to raise this challenge because it otherwise will be deprived of its defense. On the contrary,

CSULB can challenge the site's sacred status, the type and degree of mitigation, and even whether public necessity justifies unmitigatable development. It simply cannot raise these personal constitutional challenges in a land use dispute with another state agency.

Finally, the third "exception" does not apply. It is based on dictum in a footnote in *Board of Education* v. *Allen* (1968) 392 U.S. 236, 241, footnote 5 [20 L.Ed.2d 1060, 1064, 88 S.Ct. 1923]. Although standing was not disputed in *Allen*, the court noted a school board could challenge a state statute requiring that public funds be used to provide textbooks for parochial, as well as public, schools, because failure to comply with the statutes could result in a loss of funds for the district and possible removal from office. Not only are those consequences absent here, the *Allen* footnote (as well as the *Singleton* plurality discussed above) addressed whether the board could meet the standing requirement for federal court litigation. If the *Allen* dictum controlled our issue, i.e., whether one state agency could challenge another's acts on constitutional grounds, the general rule would be swallowed, since all state employees are required to follow the law. CSULB says this problem could be solved by eliminating the oath requirement. We do not see how doing so would change the trustees' responsibilities. Moreover, the revenue loss here is some speculative loss of revenue from some unspecified development, not a reduction in state funds as might have followed in *Allen*.

We think this case falls within the general rule. The rights forwarded by CSULB are personal rights designed to protect individuals from governmental violations of their constitutional rights. They are not designed to be used as leverage by one state agency in a dispute with another agency about the appropriate use of state-owned land. Nothing prevents students, abutting property owners, or taxpayers from raising these challenges. This is not a situation where one agency's acts are so outrageous (e.g., the NAHC is not seeking to use the land to establish a concentration camp for political dissidents or minority groups) that the affected individuals would be too cowed to assert their rights.

Finally, as noted above, our decision does not essentially dedicate this land for Native American religious worship. It merely means that CSULB cannot pursue this particular development plan without taking mitigation measures, or, if none can be taken, without showing that the public interest nonetheless requires development. The case has yet to be tried. We still do not know the precise nature of the proposed development. If, as CSULB asserts, the plaintiffs insist that no mitigation is possible and that absolutely nothing can be done to the disputed area, development still could proceed if the public interest so required.

## DISPOSITION

We reverse the judgment and remand the matter for trial. Plaintiffs are entitled to their costs.

Vogel (Miriam A.), J., and Masterson, J., concurred.

A petition for a rehearing was denied December 31, 1996, and respondent's petition for review by the Supreme Court was denied April 2, 1997.