[No. B091323. Second Dist., Div. One. Feb. 6, 1996.]

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Plaintiff and Appellant, v.
LLOYD W. AUBRY, JR., as Director, etc., Defendant and Respondent.

COUNSEL

James E. Holst, Gary Morrison, Stephen P. Morrell, Gibson, Dunn & Crutcher, William Claster and Marianne Shipp for Plaintiff and Appellant.

John M. Rea, Vanessa L. Holton, Anthony Mischel and Ornah R. Becker for Defendant and Respondent.

Carroll & Scully, Donald C. Carroll and Charles P. Scully II as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**ORTEGA, J.**—The Regents of the University of California (UC), using non-state-appropriated money, contracted with private companies to build subsidized married student and faculty/staff housing on university-owned land near, but not on, its Los Angeles campus (UCLA). UC did so to financially assist married students to attend, and faculty and staff to work at, UCLA, who otherwise could not do so because of high nearby housing costs. To keep the projects' costs as low as possible, thus permitting the resulting subsidies to be large enough to achieve its goal, UC, a constitutionally autonomous entity generally exempt from state regulation (Cal. Const., art. IX, § 9), chose to permit its private contractors to pay their private employees less than the prevailing wage, which ordinarily applies to public projects. UC believed it could do so because the projects involved internal UC policy and the prevailing wage law (Lab. Code, § 1770 et seq.) was not of statewide concern.

However, the California Department of Industrial Relations (Department), authorized to decide when prevailing wages must be paid on public projects, ordered UC to compel its contractors to pay prevailing wages. The Department concluded the prevailing wage law is of statewide concern, and the projects were not part of UC's essential educational mission. UC unsuccessfully petitioned the trial court to reverse the Department. UC appeals.

We hold the prevailing wage law is not a matter of statewide concern for projects, like these, which are part of UC's core educational function. We reverse the trial court's contrary finding, and instruct it to order the Department to rescind its order that UC require its contractors to pay prevailing wages on these projects.

### FACTS AND PROCEDURAL HISTORY

A. *The Westchester Bluffs Project: Subsidized Faculty/Staff Housing.*

In 1989, a UC study concluded there was a shortage of nearby moderately priced housing for UCLA faculty and staff, which hurt UCLA's ability to recruit and retain qualified faculty and staff. To address this problem, UC bought 57 acres of land in Westchester Bluffs, about 10 miles south of

UCLA. UC agreed the seller, Watt/Parker Inc., would design and sell 86 homes on site to UCLA faculty and staff.

In order to keep the project's costs as low as possible, to assure sufficient home subsidies to meet its goal, UC decided, pursuant to its existing prevailing wage policy, not to pay prevailing wages on the Westchester Bluffs project.[1] None of UC's relevant contracts with its private contractors on the project require payment of prevailing wages.

The Westchester Bluffs project was not financed directly or indirectly by state-appropriated funds. In April 1989, UC borrowed $42,020,000 from First Interstate Bank solely to fund the Westchester Bluffs project. Both the original loan and a later refinancing agreement stated the loan would be repaid exclusively from proceeds of Westchester Bluffs home sales to UCLA faculty and staff. The agreements stated if not enough homes were sold to UCLA faculty and staff to repay the loan, any remaining balance would be paid from the UCLA Chancellor's Fund, which includes no state money, and no state money would be used. Construction began in July 1991 and now is complete.

Throughout construction, UC did not expect to sell any of the homes to the public. However, by 1993, the local real estate market changed from rapid appreciation to depreciation, and a UC hiring and salary freeze reduced the number of potential UCLA purchasers. Thus, on January 20, 1994, UC decided to offer some of the homes for public sale because not enough had been bought by UCLA faculty and staff. However, UC, a tax-exempt nonprofit entity, was to receive no profit or other advantage from the public sales, which were to be at market value and transfer title to the buyers in fee simple without conditions. Moreover, since competing private homes are built without prevailing wage payments, UC gained no competitive sales advantage.

B.  *The Mar Vista Project: Subsidized Married Student Housing.*

The Mar Vista project involves demolishing 647 deteriorated 40-year-old units on UC land near, but not on, the UCLA campus, and replacing them

---

[1]UC's 1989 prevailing wage policy stated that it would pay prevailing wages on projects paid for with state funds, constructed under UC construction contracts, or located on UC land in which UC managed the project or leased at least 50 percent of the resulting space. However, the policy stated that UC could choose not to pay prevailing wages if the project was "constructed on a campus or on property of [UC], . . . and if (i) the cost will be paid entirely by non-state funds furnished principally by, or will be financed by loans repaid by students, faculty, staff, hospital patients, outside corporations or donors or (ii) the project is built for sale or lease to students, faculty, or staff and cannot, in the sole determination of the responsible [UC] administrator, be constructed economically or practically if the payment of prevailing wage rates is required . . . ."

with 912 new units and related facilities, including a 170-person childcare facility, and greater security. Like the Westchester Bluffs project, no direct or indirect state appropriated funds are being used to finance the project. Initially, UC obtained an interim commercial loan to begin the project, which later was funded by revenue bonds. No state funds were used to pay off the initial loan. The revenue bonds will be repaid from rents paid by UCLA students for the new units and do not create a state funding obligation. The Mar Vista project is under construction and is expected to be completed in 1997.

As with the Westchester Bluffs project, UC decided not to require its contractors to pay prevailing wages to their employees because doing so would raise the units' costs, thus requiring higher student rents. A UC study concluded that in an area of high rental prices, the higher rents would make some students unable to attend UCLA who could otherwise do so if the rents were lower.[2] The recent recession, state budget cuts in UC support, and student fee increases have reduced the affordability of a UCLA education. Married students with children, primarily graduate students, have the fewest resources from which to finance a UCLA education. None of UC's relevant contracts with its private builders requires them to pay their employees prevailing wages.

## C. *The Department's Decision.*

The Department requested information from UC for both projects regarding whether they were governed by the prevailing wage law. The Department initially determined both projects were subject to the prevailing wage law. UC administratively appealed both decisions. In both cases, the Department rejected the appeals, finding the projects covered by an exception to UC's general autonomy from state regulation because they involve matters of statewide concern which do not involve internal UC affairs.

---

[2]At the time UC approved the Mar Vista project, UC's prevailing wage policy was similar to the 1989 policy regarding when prevailing wages would be paid. The policy also stated it would not require "payment of prevailing wage rates by contractors and subcontractors on construction or maintenance contracts undertaken by developers on a campus or on property of [UC], . . . where the project cannot, in the sole determination of the responsible [UC] administrator, be constructed economically or practically if the payment of prevailing wages is required, and where either of the following conditions exist: [¶] (i) the cost will be paid entirely with funds not furnished by the State . . . , and the funds are furnished principally by students, faculty, staff, hospital patients, outside corporations, or donors or where the construction or maintenance contract is funded by loans which will be repaid by any of the above; or [¶] (ii) the project is built for sale or lease to students, faculty, or staff without any funds being furnished by the State . . . ." The policy also stated: "Upon an appropriate showing or exceptional need, [UC]'s Senior Vice President—Business and Finance may authorize an exception to the prevailing wage requirements of these Guidelines that permits a construction or maintenance project to proceed without the payment of prevailing wages."

## D. *The Trial Court Decision.*

UC sought judicial review of the Department's decisions. (Code Civ. Proc., § 1085.) UC sought judgment on a peremptory writ. The trial court denied the motion, and entered judgment denying UC's petition. The court reasoned that while the state Constitution exempted UC from state regulation, a 1976 amendment limited that autonomy by requiring UC to adhere to competitive bidding practices, which the court felt included the prevailing wage law.[3] The court further explained that the projects are of statewide concern, because they are "involved in a state university, [and] draw[] students from all over the state. [¶] The state university['s] standing within the state, and . . . maybe nation-wide and perhaps world-wide, depends on its facilities . . . . [T]he court . . . appl[ies] the prevailing wage . . . so that the university of this state gets at least the minimum quality work and not substandard work for the university, and that is also a state-wide concern." UC appeals from the judgment. (Code Civ. Proc., § 904.1, subd. (a)(1).)

## ISSUE

■ UC contends its constitutional exemption from state regulation permits it to ignore the prevailing wage law for these projects. UC argues the prevailing wage law is not of statewide concern, and these projects involve internal UC policy because they are part of its core educational mission.

The Department contends the prevailing wage law is an exception to UC's otherwise broad exemption from state regulation because it is of statewide concern, and these projects do not involve internal UC policy because they are not part of its core educational function.

## DISCUSSION

■ The facts discussed above are undisputed. Where that is so, in reviewing trial court decisions in mandamus actions, we conduct independent de novo review of the trial court's legal conclusions. The trial court's reasons for its ruling do not bind us. We review the ruling, not its rationale.

---

[3]The State Building and Construction Trades Council of California, AFL-CIO filed an amicus curiae brief supporting the Department. In that brief, amicus curiae conceded "that competitive bidding is not the same thing as the prevailing wage law." On appeal, neither the Department nor amicus curiae defends the judgment by arguing the prevailing wage law is part of the competitive bidding law. Based on these concessions, we do not address whether the prevailing wage law is part of the competitive bidding law, or the effect of the 1976 amendment to UC's constitutional exemption from state regulation.

(*McIntosh* v. *Aubry* (1993) 14 Cal.App.4th 1576, 1583-1584 [18 Cal.Rptr.2d 680].)

Article IX, section 9, subdivision (a) of the California Constitution provides: "[UC] shall constitute a public trust . . . with full powers of organization and government, subject only to such legislative control as may be necessary to insure the security of its funds and compliance with the terms of the endowments of [UC] and such competitive bidding procedures as may be made applicable to [UC] by statute for the letting of construction contracts, sales of real property, and purchasing of materials, goods, and services. . . ."

■ "Article IX, section 9, grants the regents broad powers to organize and govern the university and limits the Legislature's power to regulate either the university or the regents. This contrasts with the comprehensive power of regulation the Legislature possesses over other state agencies.

"The courts have also recognized the broad powers conferred upon the regents as well as the university's general immunity from legislative regulation. '"The Regents have the general rule-making power in regard to the University . . . and are . . . fully empowered with respect to the organization and government of the University . . . ." [Citations.] "[T]he power of the Regents to operate, control, and administer the University is virtually exclusive. [Citations.]" ' [Citations.] [¶] . . . '[T]he University is intended to operate as independently of the state as possible. (See Cal. Const., art. IX, § 9.)' [Citation.] . . .

"It is true the university is not completely free from legislative regulation. In addition to the specific provisions set forth in article IX, section 9, there are three areas of legislative regulation. First, the Legislature is vested with the power of appropriation, preventing the regents from compelling appropriations for salaries. [Citations.]

"Second, it is well settled that general police power regulations governing private persons and corporations may be applied to the university. [Citations.] For example, workers' compensation laws applicable to the private sector may be made applicable to the university.

"Third, legislation regulating public agency activity not generally applicable to the public may be made applicable to the university when the legislation regulates matters of statewide concern not involving internal university affairs. [Citation.]" (*San Francisco Labor Council* v. *Regents of University of California* (1980) 26 Cal.3d 785, 788-789 [163 Cal.Rptr. 460, 608 P.2d 277] (hereafter, *Labor Council* v. *UC*).)

■ The prevailing wage law (Lab. Code, § 1770 et seq.) requires that private contractors building construction projects for public entities pay their employees prevailing wages in the local labor market as set by the Department. "The Legislature has declared that it is the public policy of California 'to vigorously enforce minimum labor standards in order to ensure employees are not required or permitted to work under substandard unlawful conditions, and to protect employers who comply with the law from those who attempt to gain competitive advantage at the expense of their workers by failing to comply with minimum labor standards.' [Citation.] . . . [¶] The overall purpose of the prevailing wage law is to protect and benefit employees on public works projects. [Citation.]" (*Lusardi Construction Co.* v. *Aubry* (1992) 1 Cal.4th 976, 985 [4 Cal.Rptr.2d 837, 824 P.2d 643].) "This general objective subsumes within it a number of specific goals: to protect employees from substandard wages that might be paid if contractors could recruit labor from distant cheap-labor areas; to permit union contractors to compete with nonunion contractors; to benefit the public through the superior efficiency of well-paid employees; and to compensate nonpublic employees with higher wages for the absence of job security and employment benefits enjoyed by public employees. [Citations.]" (*Id.* at p. 987.) ■ We must decide if UC's broad exemption from state regulation permits it to ignore the prevailing wage law.

UC argues the issue already has been decided in its favor by *Labor Council* v. *UC, supra,* 26 Cal.3d 785. There, our Supreme Court held a statute requiring UC to pay its employees minimum salaries no less than prevailing wages conflicted with California Constitution, article IX, section 9, and thus could not be enforced against UC. Because, as we shall discuss, we agree with UC that the case controls our issue, we quote it at length. After discussing the extent and limitations on UC's exemption from state regulation quoted above, the Supreme Court applied its analysis to the disputed statute: "[The statute] cannot be brought within any of the three categories [of exceptions to UC's general exemption from state regulation]. A provision requiring an employer to pay prevailing wages in the community does not constitute an appropriation bill. Moreover, the Legislature remains free to refuse to appropriate the money necessary to pay prevailing wages. [Citations.]

"Nor may [the statute] be construed as a general regulation pursuant to the police power applicable to private individuals and corporations. Prevailing wage regulations are substantially different from minimum wage statutes. A prevailing wage is in the nature of an average wage, and private persons and corporations will pay both above and below the average. Although . . . the

Legislature and some local agencies have adopted statutes and ordinances requiring payment of prevailing wages by some governmental agencies and some of their contractors, a number of governmental agencies are not required to pay the prevailing wage. [Citation.] There is no showing that prevailing wage requirements have been made generally applicable to private persons and corporations.

"Finally, our recent decision in *Sonoma County Organization of Public Employees* v. *County of Sonoma* (1979) 23 Cal.3d 296 . . . , leads us to conclude a prevailing wage requirement is not a matter of statewide concern. In that case we held 'the determination of wages paid to employees of charter cities as well as charter counties is a matter of local rather than statewide concern.' *Sonoma* invalidated statutory provisions cutting off state appropriations to cities and counties giving wage raises to employees. [Citation.] We pointed out that the fact the Legislature had declared the matter to be one of statewide concern is not controlling. [Citations.] Even before the 1970 constitutional amendment giving charter cities 'plenary' authority over employee compensation, it was 'held that the salaries of local employees of a charter city constitute municipal affairs and are not subject to general laws. [Citations.]' [Citation.]

"A statute requiring payment of prevailing wages or more is effectively a salary setting statute. Public agencies' use of taxpayers' funds to pay in excess of a prevailing wage is unwarranted, and while the statute purports to establish a minimum wage, it in effect determines the wage. Like the statute in *Sonoma* which did not set actual wages but relied upon an extrinsic fact—prior wages—the statute now before us also relies upon an extrinsic fact—prevailing wages—to fix compensation. Although the Legislature has declared that the matter is one of statewide concern [citation], the declaration is not controlling as pointed out in *Sonoma* [citation].

"Plaintiffs seek to distinguish *Sonoma* by noting that unlike cities and counties, the university possesses neither tax power nor delegated police power. However, the *Sonoma* decision was based not on existence of tax or delegated police power but on constitutional power in local authority, to the exclusion of legislative interference. As we have seen, article IX, section 9, establishing the independence of the university also curtails legislative power. Salary determination is as important to the autonomy of the university as it is to the independence of chartered cities and counties." (*Labor Council* v. *UC, supra,* 26 Cal.3d at pp. 789-791.)

The Department argues *Labor Council* v. *UC, supra,* 26 Cal.3d 785, should be limited to its facts because it dealt with salaries of UC employees.

However, as the extensive passage quoted above illustrates, nothing in the opinion's language so limits it. The Department argues the opinion's extensive analysis holding that prevailing wage laws are not of statewide concern is dictum. However, to affirm the trial court's judgment for UC, the court had to find none of the three exceptions to UC's broad exemption from state regulation applied. The court's decision that the prevailing wage law was not of statewide concern was necessary to its decision. Thus, we reject the Department's argument that the case's language is dictum. Unless persuaded otherwise, we must follow controlling Supreme Court opinions. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

More recently, the Court of Appeal in *Vial* v. *City of San Diego* (1981) 122 Cal.App.3d 346 [175 Cal.Rptr. 647], affirmed a denial of the Department's writ petition seeking to force the city to comply with the prevailing wage law. The city rescinded an earlier ordinance requiring payment of prevailing wages on city construction projects in favor of a policy where such wages would be paid only when required by state or federal grants or where the particular job was of statewide concern. The court held: "Under the California Constitution, a chartered city enjoys autonomy over its 'municipal affairs' [citation]. Consequently, a chartered city's ordinances which deal with purely municipal affairs are valid even if they conflict with general laws. On the other hand, general laws on subjects of statewide concern supersede any conflicting enactments of chartered cities. Deciding whether a particular ordinance deals with municipal affairs or a subject of statewide concern is a judicial, not a legislative, function [citation]. The prevailing wage law, a general law, does not apply to the public works projects of a chartered city, as long as the projects in question are within the realm of 'municipal affairs' [citation]. The expenditure of a city's funds on such projects and the rates of pay of the workers whom it hires to carry them out are municipal affairs [citation]. Here the rescinding resolution specifically excludes state and federally funded projects and those 'considered to be of State concern'; application of the resolution is limited to projects within the sphere of 'municipal affairs.' . . . [T]he resolution is valid despite its conflict with the general prevailing wage law." (*Id.* at p. 348.)

The Department argues the language in *Lusardi Construction Co.* v. *Aubry, supra,* 1 Cal.4th 976, quoted above, somehow limits or overrules the express holding of *Labor Council* v. *UC, supra,* 26 Cal.3d 785. We disagree. The issue in *Lusardi* was whether the prevailing wage law applied only to public projects where the contract expressly required the private contractor to pay prevailing wages. The Supreme Court rejected that position, holding the

prevailing wage law was a statutory, not contractual, creation, but did not address in what situations exceptions, such as those for UC and chartered cities discussed above, applied. The *Lusardi* court did not address whether the prevailing wage law was a matter of such statewide concern as to outweigh the ability of UC or chartered cities to pay lower wages to advance, respectively, their educational or municipal objectives.

The Department also relies on *Division of Lab. Stds. Enforcement* v. *Ericsson Information Systems, Inc.* (1990) 221 Cal.App.3d 114 [270 Cal.Rptr. 75] (*Ericsson*). In *Ericsson*, a UC contract called for a private contractor installing a telephone system in an existing UC building to pay prevailing wages, but UC did not specify what those wages were nor did the contractor actually pay prevailing wages. The Department sought to compel payment of prevailing wages. The court held: "*As to this contract*, UC[] is not exempt from the public works prevailing wage laws." (*Id.* at p. 122, italics added.) The holding was based on both the contractual prevailing wage requirement and the fact that the particular contract did not involve internal UC affairs. The opinion's opening paragraph stated: "We hold [UC] is subject to the public works prevailing wage laws designed to protect private sector employees on public works which do not involve the internal affairs of [UC]." (*Id.* at p. 117.) Thus, *Ericsson* does not stand for the proposition that the prevailing wage law is always of statewide concern.

The Department argues the Westchester Bluffs and Mar Vista projects are not part of UC's core educational mission, primarily because they say UC could simply pay money subsidies to married students and to faculty and staff, rather than build subsidized housing. However, the fact that UC might choose alternative means to achieve its goals does not remove those goals from UC's core educational function. Ensuring access to qualified students who otherwise could not attend, and securing the services of outstanding faculty and staff who otherwise might decline to accept or continue employment, is at the heart of UC's educational function, as is giving those students who do attend the best education possible.

Moreover, UC's policy of paying prevailing wages on some projects but not on others, depending on their nature, supports our conclusion. The Department argues this policy should compel us to reject UC's position. On the contrary, the policy demonstrates UC is not simply trying to save money other public agencies are required to expend, but rather is attempting to reconcile the competing policies of UC independence and the prevailing wage law where it can do so.

The prevailing wage law is not universally applied. Chartered cities are exempt from it, at least in areas not involving statewide concern. While such

cities may choose to pay prevailing wages in such situations, they are free to balance the competing policies of paying prevailing wages against those of serving public needs at lower costs by not doing so. Likewise, UC may further its core educational function by not paying prevailing wages, as in this case. Thus, we follow the holding of *Labor Council* v. *UC*, *supra*, 26 Cal.3d 785, and hold that these projects can proceed without a prevailing wage requirement because they do not involve matters of statewide concern and involve internal UC affairs vital to its core educational function.

## DISPOSITION

We reverse the judgment. We remand the case to the trial court with instructions that it grant UC's petition, order the Department to rescind its order requiring payment of prevailing wages on these projects, and enter judgment for UC. UC is entitled to its costs on appeal.

Spencer, P. J., and Vogel (Miriam A.), J., concurred.

Review by the Supreme Court was denied April 18, 1996. Mosk, J., was of the opinion that review should be granted.