Filed 8/27/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>MICHAEL LOFCHIE,<br><br>    Defendant and Respondent. | B248383<br><br>(Los Angeles County<br>Super. Ct. No. BA393121) |

        APPEAL from an order of the Superior Court of Los Angeles County.  Clifford L. Klein.  Affirmed.

        Jackie Lacey, District Attorney, Phyllis C. Asayama and Mathew Brown, Deputy District Attorneys for Plaintiff and Appellant.

        Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, Gary S. Lincenberg and Benjamin D. Lichtman for Defendant and Respondent.

        Crowel & Moring and J. Daniel Sharp; University of California Los Angeles Office of Legal Affairs and Kevin S. Reed; University of California Los Angeles Office of the General Counsel and Charles F. Robinson, Karen J. Petrulakis, Stephen P. Morrell, Mark Morodomi, and Elizabeth C. Yap as Amicus Curiae on behalf of Defendant and Respondent.

The issue presented in this case is whether a University of California[1] faculty member may be criminally prosecuted under Government Code section 1090[2] for participating in a decision to hire his wife as a program assistant for a four-week summer study abroad course. We conclude that he may not, and for reasons we discuss affirm the trial court's order dismissing the information under Penal Code section 995.

## BACKGROUND

Defendant Michael Lofchie (Lofchie) has been a faculty member at the University of California at Los Angeles since 1964. He was chairman of the political science department in 2008. In July 2008, Lofchie taught a four-week summer session abroad course and participated in a decision to hire his wife, Kelly Comras Lofchie (Comras), as a program assistant for the 2008 summer session. Comras was hired by the University's Office of Summer Sessions and was paid $3,100 plus a per diem for her expenses.

Richard Anderson, another professor in the political science department, also taught a class in the University's 2008 summer session. When Anderson learned that Comras had been hired as a program assistant, he objected, first to Lofchie, and then to the person who succeeded Lofchie as chairman of the political science department. Anderson also filed an anonymous whistleblower complaint and met with the University's director of compliance and the dean of the social science division. When the University's administration rejected his complaint, Anderson brought the matter to the attention of the Los Angeles County District Attorney.

The district attorney, on behalf of the People of the State of California,[3] filed an information charging Lofchie with a felony violation of section 1090, alleging he was "financially interested" in a contract made by him in his official capacity to hire Comras as a program assistant in the summer of 2008. Lofchie filed a motion under Penal Code

---

[1]    Hereinafter, the University of California, or simply, the University.

[2]    All further statutory references are to the Government Code, unless stated otherwise. Section 1090 may be referred to as section 1090 or Government Code section 1090.

[3]    The district attorney is referred to hereinafter as the People.

section 995 to set aside the information on various grounds, including that article IX, section 9 of the California Constitution (hereafter article IX, section 9 or Cal. Const., art. IX, § 9) precludes the Legislature from regulating the employment practices of the University of California through Government Code section 1090; that section 1090 does not apply to a University of California professor; and that a more specific statute, Public Contract Code section 10516, preempts application of Government Code section 1090. The People opposed the motion.

After hearing argument from the parties, the trial court granted Lofchie's motion to set aside the information. This appeal followed.

## THE PARTIES' CONTENTIONS

Lofchie and the Regents of the University of California (the Regents), to whom we granted leave to file an amicus brief, both argue that section 1090 does not apply to the University because it is not the "state" within the meaning of the statute, but rather a constitutionally created public trust subject to legislative control in only specifically enumerated areas that do not include internal hiring decisions. The Regents further contend University of California employees are already subject to internal conflict of interest policies, including policies that address conflicts of interest in decisions involving spouses and family members, and that the district attorney's expansive interpretation of section 1090 would render the statute an unconstitutional interference with university autonomy. Lofchie also contends the People forfeited the right to argue on appeal that he is a state employee because they took the opposite position in the trial court below; that Public Contract Code section 10516 supplants Government Code section 1090; and section 1090 is unconstitutionally vague as applied to him.

The People contend they did not forfeit any argument that the University of California is a state entity and Lofchie is an employee of the "state" within the meaning of section 1090. The People further contend article IX, section 9 does not exempt the University from regulation under Government Code section 1090, and Public Contract Code section 10516 does not preclude application of section 1090.

3

**DISCUSSION**

## I. Forfeiture

Lofchie argues that the doctrines of waiver and invited error preclude the People from pursuing this appeal because they expressly conceded in the trial court below that he is not a state employee. The doctrine of waiver precludes a party from changing its position and adopting a new and different theory on appeal because ""to do so would not only be unfair to the trial court, but manifestly unjust to the opposing party."" (*Saville v. Sierra College* (2005) 133 Cal.App.4th 857, 873.) "Under the doctrine of invited error, when a party by its own conduct induces the commission of error, it may not claim on appeal that the judgment should be reversed because of that error. [Citations.]" (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212.)

The People acknowledge that they took inconsistent positions in the proceedings below regarding Lofchie's employment status, at times conceding he is not a "state employee," but rather a "public employee" subject to section 1090. They argue, however, that both Lofchie and the trial court understood the People's position to be that University employees such as Lofchie are subject to section 1090, that Lofchie suffered no prejudice, and that there was no invited error on the part of the trial court.

We agree that there was neither prejudice nor invited error. Lofchie successfully opposed the People's arguments in the trial court below that section 1090 applied to him as either a "state employee" or a "public employee." The trial court's memorandum of decision expressly rejects the People's argument that University of California employees should be included as employees of the "state" within the meaning of section 1090.

Finding no grounds for forfeiture, we address the merits of the parties' contentions.

## II. The legal framework

### A. *Section 1090*

Section 1090 provides:

> "Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any

4

contract made by them in their official capacity, or by any body or board of which they are members. Nor shall any state, county, district, judicial district, and city officers or employees be purchasers at any state sale or vendors at any purchase made by them in their official capacity.

"As used in this article, 'district' means any agency of the state formed pursuant to general law or special act, for the local performance of governmental or proprietary functions within limited boundaries."

Section 1090 "represents the Legislature's decision to codify the common law rule prohibiting public officials from having a personal financial interest in the contracts they form in their official capacities. [Citation.]" (*People v. Wong* (2010) 186 Cal.App.4th 1433, 1450.) A contract is made for purposes of section 1090 if the public official "had the opportunity to, and did, influence execution [of the contract] directly or indirectly to promote his personal interests. [Citation.]" (*People v. Sobel* (1974) 40 Cal.App.3d 1046, 1052.) A public official can violate the statute even if he did not participate in the execution of the contract. (*Ibid.*)

There are both civil and criminal remedies for violations of section 1090. Contracts made in violation of the statute may be voided by any party, except the interested party. (§ 1092.) Persons who willfully violate section 1090 are subject to criminal sanctions, including a fine of up to $1,000, imprisonment in state prison, and disqualification from holding any office in the state. (§ 1097.)[4]

---

[4]   Criminal sanctions for violation of section 1090 are set forth in section 1097, which states: "Every officer or person prohibited by the laws of this state from making or being interested in contracts, or from becoming a vendor or purchaser at sales, or from purchasing scrip, or other evidences of indebtedness, including any member of the governing board of a school district, who willfully violates any of the provisions of such laws, is punishable by a fine of not more than one thousand dollars ($1,000), or by imprisonment in the state prison, and is forever disqualified from holding any office in this state."

### B. *Article IX, section 9*

The University of California is a public trust established pursuant to article IX, section 9.[5]  Article IX, section 9(a)(f) provides in pertinent part:

> "(a) The University of California shall constitute a public trust, to be administered by the existing corporation known as 'The Regents of the University of California,' with full powers of organization and government, subject only to such legislative control as may be necessary to insure the security of its funds and compliance with the terms of the endowments of the university and such competitive bidding procedures as may be made applicable to the university by statute for the letting of construction contracts, sales of real property, and purchasing of materials, goods, and services. . . ."

> "[¶] . . . [¶]

> "(f) . . . The university shall be entirely independent of all political or sectarian influence and kept free therefrom in the appointment of its regents and in the administration of its affairs . . . ."

The California Supreme Court has recognized that "[a]rticle IX, section 9, grants the regents broad powers to organize and govern the university and limits the Legislature's power to regulate either the university or the regents."[6]  (*San Francisco Labor Council v. Regents of Univ. of Cal.* (1980) 26 Cal.3d 785, 788 (*Labor Council*).)  This constitutional grant of power to the Regents includes both quasi-judicial and quasi-

---

[5]    The University of California was originally a corporation, with the Regents as its board of directors.  (Stats. 1967-1868, ch. 244, p. 248 [Organic Act of 1868].)  During the first decade of the University's existence, controversy arose among political factions seeking to control the University's governance and curriculum.  A "decisive battle" was waged in the constitutional convention of 1879, culminating in the adoption of article IX, section 9 and the establishment of the University as a constitutionally created public trust.  (See Horowitz, *The Autonomy of the University of California Under the State Constitution* (1977) 25 UCLA L.Rev. 23, 25.)

[6]    In contrast, the Legislature possesses comprehensive powers of regulation "over the California State University, which '"is subject to full legislative control and has 'only such autonomy as the Legislature has seen fit to bestow." [Citation.] . . .'"  (*Native American Heritage Com. v. Board of Trustees* (1996) 51 Cal.App.4th 675, 684, quoting *Slivkoff v. Board of Trustees* (1977) 69 Cal.App.3d 394, 401.)

legislative powers, according them "virtual autonomy in self-governance." (*Regents of University of California v. City of Santa Monica* (1978) 77 Cal.App.3d 130, 135.) "'The Regents have the general rule-making or policy-making power in regard to the University . . . and are . . . fully empowered with respect to the organization and government of the University. . . .' [Citations.]" (*Regents of Univ. of Cal. v. Superior Court* (1970) 3 Cal.3d 529, 540.) "[P]olicies established by the Regents as matters of internal regulation may enjoy a status equivalent to that of state statutes [citation]." (*Regents of University of California v. City of Santa Monica, supra*, at p. 135; *Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 321 [Regents' policy for handling whistleblower claims under their power to govern and organize the University is treated as a statute in order to determine whether the exhaustion doctrine applies].)

Courts have recognized not only the broad powers accorded to the Regents to govern the University of California, but also the University's "general immunity from legislative regulation." (*Labor Council, supra*, 26 Cal.3d at p. 788.) For example, courts have found the Regents and the University to be exempt from regulation under the state prevailing wage law (*id*. at p. 787; *Regents of University of California v. Aubry* (1996) 42 Cal.App.4th 579, 591), state overtime regulations (*Kim v. Regents of University of Cal.* (2000) 80 Cal.App.4th 160, 166-167), state statutes authorizing certain employee payroll deductions (*California State Employees' Asso. v. Regents of University of California* (1968) 267 Cal.App.2d 667), a statute requiring employer indemnification of employee work uniform expenses (*In re Work Uniform Cases* (2005) 133 Cal.App.4th 328, 344), and a Labor Code statute mandating an award of attorney fees and costs to the prevailing party in an action related to pension fund eligibility, unpaid wages, or fringe benefits (*Goldbaum v. Regents of University of California* (2011) 191 Cal.App.4th 703, 706 (*Goldbaum*)).

The Regents and the University of California are not completely exempt from legislative regulation. As discussed, article IX, section 9 delineates three areas in which the University and the Regents are subject to legislative control -- insuring the security of its funds, compliance with the terms of its endowments, and competitive bidding

7

procedures made applicable to the University by statute for awarding construction contracts, sales of real property, and purchase of materials, goods, and services.

Apart from the forms of legislative control specifically listed in the California Constitution, there are only three areas in which the Regents and the University of California are subject to legislative regulation. The California Supreme Court has enumerated these three areas as follows: "First, the Legislature is vested with the power of appropriation, preventing the regents from compelling appropriations for salaries. [Citations.] [¶] Second, it well settled that general police power regulations governing private persons and corporations may be applied to the university. [Citations.] For example, workers' compensation laws applicable to the private sector may be made applicable to the university. [¶] Third, legislation regulating public agency activity not generally applicable to the public may be made applicable to the university when the legislation regulates matters of statewide concern not involving internal university affairs. [Citation.]" (*Labor Council, supra*, 26 Cal.3d at p. 789.) Deciding what constitutes a matter of statewide concern is a judicial, and not a legislative function. (*Regents of University of California v. Aubry, supra*, 42 Cal.App.4th at p. 589.)

**III. Whether section 1090 applies to the University**

The People contend section 1090 falls into the third category of permissive legislative regulation of the University delineated by the Supreme Court in *Labor Council*, because prohibiting state employees from engaging in self-dealing when contracting on behalf of the state is a matter of "statewide concern." The People further contend the term "state" as used in section 1090 includes the University of California and that Lofchie is a "state" employee. Whether Lofchie and the University come within the ambit of section 1090 is an issue of statutory interpretation that we review de novo. (*Farahani v. San Diego Community College Dist.* (2009) 175 Cal.App.4th 1486, 1491.) Whether the University is constitutionally immune from legislative regulation under section 1090 is a legal issue also subject to our independent review. (*Goldbaum, supra*, 191 Cal.App.4th at p. 710.) These two legal issues are entwined with one another.

8

### A. *Statutory construction analysis*

#### 1. General principles

The fundamental rule of statutory construction is that the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. (*Select Base Materials v. Board of Equalization* (1959) 51 Cal.2d 640, 645 (*Select Base*).) In determining the intent of the Legislature, we first examine the words of the statute itself. (*California Teachers Assn. v. San Diego Community College Dist*. (1981) 28 Cal.3d 692, 698.) If the language of the statute is clear and unambiguous, there is no need for statutory construction. (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.) However, "the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose." (*Ibid*.) "'We must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' [Citation.]" (*People v. Coronado* (1995) 12 Cal.4th 145, 151.) The Legislative purpose "will not be sacrificed to a literal construction" of any part of the statute. (*Select Base*, at p. 645.)

#### 2. Neither the plain language nor the legislative history of section 1090 reflect an intent to include the University of California

Section 1090 does not define the term "state." The term is defined elsewhere in sections of the Government Code that govern the construction of that code. (§§ 5, 18.) Section 18 defines "State" as "the State of California, unless applied to different parts of the United States," in which case "it includes the District of Columbia and the territories." (§ 18.) But that definition is unhelpful in determining whether the University of California is considered the "state" and whether a University professor is a "state employee" within the meaning of section 1090.

Because the language of section 1090 provides no definitive answer as to whether it applies to the University of California, we turn to the legislative history and the purposes to be achieved by the statute. (*People v. Coronado, supra*, 12 Cal.4th at p. 151.) In addition, the statute must be construed " 'with reference to the whole system of

9

law of which it is a part so that all may be harmonized and have effect.' [Citation.]" (*Select Base, supra*, 51 Cal.2d at p. 645.)

The legislative history for section 1090 contains no expression of intent to include the University of California and its employees within the ambit of the statute. The predecessor statute to section 1090 was enacted in 1851, before the University of California existed,[7] and applied to government officials only. It prohibited "any government official or legislator from being 'interested in any Contract made by such Officer or Legislature of which he is a member . . . in the discharge of his official duties.' [Citations.]" (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1072, fn. 10, quoting Stats. 1851, ch. 136, § 2, p. 522.) That prohibition was later codified in former section 920 of the Political Code and, in 1943, moved with only minor changes to the Government Code. (*Lexin*, at p. 1072.) When the Legislature added the term "employee" to section 1090 in 1963 (Stats. 1963, ch. 2172, p. 4559), the Legislative Council's Digest described the statute as a proscription on governmental actors only: "Provides that employees, as well as officers of various governmental, judicial and legislative bodies, shall not be interested in any contract executed by them in official capacity." (Legis. Counsel's Dig., Assem. Bill No. 402 (1963 Reg. Sess.) 2 Stats. 1963, Summary Dig., p. 151.) Nothing in the history of section 1090 refers to the University of California or its employees.

The People argue that the language of section 1090 has been interpreted broadly in order to uphold the strong public policy against public officials having a personal financial interest in contracts they form in their official capacities, and that the terms "state" and "state employee" should therefore be broadly construed to include the University and its employees. It is true that section 1090 has been construed broadly with respect to the scope of contractual or financial interests it covers (see, e.g., *Stigall v. Taft* (1962) 58 Cal.2d 565, 571 [prohibited interest can include not only execution of contract,

---

[7]     The University of California was established by the Organic Act of 1868. (Stats. 1867-1868, ch. 244, p. 248.)

but also planning and preliminary discussions]; *People v. Honig* (1996) 48 Cal.App.4th 289, 322-323 [prohibited financial interest can be direct or indirect]), but not with respect to the scope of individuals covered. (See *Klistoff v. Superior Court* (2007) 157 Cal.App.4th 469, 480, fn. 2 [section 1090's "application is expressly restricted to the public officials enumerated in that statute"].)

In *People v. Christiansen* (2013) 216 Cal.App.4th 1181, Division One of this court rejected an argument similar to the one advanced by the People in this case that the term "employees" as used in section 1090 should be broadly construed to include independent contractors. As support for its expansive interpretation of this statutory term, the Attorney General in *Christiansen* cited cases in which civil liability had been imposed on independent contractors under section 1090. (*Id.* at p. 1189.) The court in *Christiansen* "express[ed] no opinion on the soundness of those opinions in the *civil* context," but held that "expansion of the statutory term 'employees' to apply to independent contractors does not apply to *criminal* prosecutions for violation of section 1090" absent a clear and unequivocal intent by the Legislature to do so. (*Id.* at pp. 1189, 1190.)

Given the absence of clear and unequivocal legislative intent to include the University of California within the ambit of section 1090, we, like the court in *Christiansen*, will not judicially expand the scope of the statute to include the University and its employees.

As support for their argument that section 1090 applies to the University, the People cite other statutory schemes, such as the Political Reform Act, section 11000, and the California Environmental Quality Act, which apply to a "state agency" and which have been applied to the University even though the University is not expressly included in the statutory definitions for "state agency." That other statutory schemes, with different statutory definitions, have been applied to the University is not a valid basis for concluding that section 1090 applies in the instant case.[8]

---

[8] The definition of "state agency" as used in section 11000 is expressly limited to title 2 of the Government Code. Section 1090 appears in title 1. (§ 11000, subd. (a).)

11

### 3.  There is no case law applying section 1090 to the University

There is no case law applying section 1090 to the University of California or its employees.  The People cite *People v. Darby* (1952) 114 Cal.App.2d 412 (*Darby*) and *People v. Elliott* (1953) 115 Cal.App.2d 410 (*Elliott*) as support for the argument that the University is the "state" and Lofchie a "state employee" within the meaning of section 1090, but both of those cases are distinguishable.

*Darby* held that an elected member of the Los Angeles Board of Education was both a "City officer" and a "state officer" under section 1090.  The elected board member was a "City officer" because the Los Angeles City Charter so provided.  He was also a "state officer" because the City of Los Angeles was empowered by the California Constitution to determine the manner in which Board members were elected or appointed, as well as the duration of their terms, qualifications, compensation, and removal.  The court in *Darby* reasoned:  "An officer is a state officer if the tasks performed by him are accomplished for and on behalf of the state notwithstanding the fact that his duties were restricted to a particular geographical portion of the state.  [Citation.]  The school district is a state agency and its board members are state officers." (*Darby, supra*, 114 Cal.App.2d at p. 423.)

The court in *Elliott* reached the same conclusion with regard to members of the City of Los Angeles School Board, noting that "[t]he term 'state officers' is not limited to officers whose jurisdiction is coextensive with the state but applies generally to persons clothed with functions which affect the public and duties assigned to them by state laws. . . .  [¶]  The matter of education is of statewide concern and is one of the responsibilities of the state government." (*Elliott, supra*, 115 Cal.App.2d at p. 415.)

Unlike the City of Los Angeles in *Darby* and *Elliott*, the University of California is not a political subdivision of the state invested with a portion of the state's governmental power -- it is a public trust. (Cal. Const., art. IX, § 9.)  The purpose of designating the University as a public trust was to insulate it from state government, ensuring that the University and its faculty would be "entirely independent of all political or sectarian influence." (Cal. Const., art. IX, § 9(f).)  Our Supreme Court has recognized

12

the "unique constitutional status of the University of California" (*Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 889), distinguishing it from other state agencies that are subject to the Legislature's comprehensive power of regulation. *Darby* and *Eliott* are thus distinguishable.

### 4. The *Williamson* rule does not apply

Lofchie argues that section 1090 must be construed with reference to Public Contract Code section 10516, a statute he claims allows University professors to make contracts in which they have a financial interest. Lofchie further argues that the more specific provisions of Public Contract Code section 10516 supplant the general provisions of Government Code section 1090 under a principle of statutory interpretation known as the *Williamson* rule, based on the Supreme Court's decision in *In re Williamson* (1954) 43 Cal.2d 651.

"Under the *Williamson* rule, if a general statute includes the same conduct as a special statute, the court infers that the Legislature intended that conduct to be prosecuted exclusively under the special statute. In effect, the special statute is interpreted as creating an exception to the general statute for conduct that otherwise could be prosecuted under either statute. [Citation.] 'The rule is not one of constitutional or statutory mandate, but serves as an aid to judicial interpretation when two statutes conflict.' [Citation.]" (*People v. Murphy* (2011) 52 Cal.4th 81, 86.) As we discuss, the *Williamson* rule does not apply because section 1090 and Public Contract Code section 10516 can be interpreted such that the two statutes do not conflict.

Public Contract Code section 10516 provides:

> "No officer or employee of the University of California shall engage in any employment, activity, or enterprise from which the officer or employee receives compensation or in which the officer or employee has a financial interest if that employment, activity, or enterprise is sponsored or funded, or sponsored and funded, by any university department through or by a university contract unless the employment, activity, or enterprise is within the course and scope of the officer's or employee's regular university employment. No officer or employee in the university shall contract on his or her own individual behalf as an independent contractor with any university department to provide services or goods. This section

13

shall not apply to officers or employees of the university with teaching or research responsibilities, nor shall it apply to student employees for payment for additional campus activities or engagements outside of the scope of their primary university employment."

An officer or employee of the University "who corruptly performs any official act" in violation of Public Contract Code section 10516 is guilty of a felony. (Pub. Contract Code, § 10522.)

Lofchie argues that the exemption accorded by Public Contract Code section 10516 to "officers or employees of the university with teaching or research responsibilities" allows a University professor to participate in the making of a University contract in which he has a financial interest. That exemption, Lofchie claims, conflicts with section 1090, to the extent section 1090 applies to University employees.

Public Contract Code section 10516 does not proscribe the same conduct as that prohibited by Government Code section 1090. Public Contract Code section 10516 does not preclude an employee from making University contracts in which the employee is financially interested. Rather, it prohibits "any *employment, activity, or enterprise*" in which the employee has a financial interest "if that employment, activity, or enterprise is sponsored or funded . . . by any university department through or by a university contract . . . ." (Pub. Contract Code, § 10516, italics added.)

The prohibition on contracts imposed by Public Contract Code section 10516 precludes a University employee from contracting "*on his or her own individual behalf as an independent contractor* with any university department to provide goods or services." (Pub. Contract Code, § 10516, italics added.) Government Code section 1090, by contrast, applies only to contracts made by state employees "in their official capacity." The two statutes do not conflict because they govern different types of conduct.

Public Contract Code section 10516, moreover, must be construed "'with reference to the whole system of law of which it is a part.'" (*Select Base, supra*, 51 Cal.2d at p. 645.) The statute is not part of the Government Code, but rather, part of chapter 2.1 of division 2 of the Public Contract Code, entitled "University of California

14

Competitive Bidding." That chapter governs competitive bidding requirements in University contracts for construction projects; contracts with private architects, engineering, environmental, and construction management firms; contracts for the sale of real property owned by the University; and contracts for the procurement of goods, services, and materials involving an expenditure of more than $50,000. (See Pub. Contract Code, §§ 10500-10506; 10509; 10510.4-10510.9; 10511-10513.) The $3,100 employment contract at issue here does not come within any of the foregoing categories.

Because Public Contract Code section 10516 and Government Code section 1090 govern different types of conduct, and the two statutes can be construed so that they do not conflict, the *Williamson* rule does not apply.

### B. Constitutional analysis

Given the University's "unique constitutional status," we must construe section 1090 with reference to article IX, section 9 in a manner that harmonizes the statute with that constitutional mandate. (*Select Base, supra*, 51 Cal.2d at p. 645.) As discussed, article IX, section 9 limits the power of the Legislature to intrude upon the administration of the University of California to three specified areas. It subjects the University to legislative control only as necessary to ensure the security of its funds, compliance with the terms of its endowments, and competitive bidding procedures made applicable to the University by statute for construction contracts, real property sales, and purchases of materials, goods, and services.

Section 1090 does not regulate the University's fund security, endowment terms, or bidding procedures. Of the additional categories of permissible legislative regulation identified by the Supreme Court in *Labor Council*, the People concede that section 1090 potentially comes within only one -- legislation regulating public agency activity not generally applicable to the public. Such legislation may be made applicable to the University only when it "regulates matters of statewide concern not involving internal university affairs." (*Labor Council, supra*, 26 Cal.3d at p. 789.)

15

### 1. Case law regarding "matters of statewide concern" versus "internal university affairs"

The distinction between "matters of statewide concern" subject to legislative regulation and "university affairs" within the exclusive control of the Regents was first made by the California Supreme Court in *Tolman v. Underhill* (1952) 39 Cal.2d 708 (*Tolman*).) At issue in *Tolman* was an oath to uphold the state and federal constitutions required by article XX, section 3 of the California Constitution and implemented by the Legislature in Government Code section 18150. (*Tolman*, at p. 710.) In addition to the statutory oath, the Regents sought to require University faculty members to execute a separate oath disclaiming membership in the communist party or in any other organization advocating overthrow of the government by force or violence. Tolman and other faculty members were unwilling to sign the University's additional oath. (*Ibid.*)

The California Supreme Court invalidated the University's oath, concluding that "state legislation has fully occupied the field and that university personnel cannot properly be required to execute any other oath or declaration relating to loyalty than that prescribed for all state employees." (*Tolman, supra*, 39 Cal.2d at p. 710.) In response to the Regents' argument that the state legislation was inapplicable because of the autonomy conferred on the University under article IX, section 9, the Supreme Court stated: "It is well settled . . . that laws passed by the Legislature under its general police power will prevail over regulations made by the regents with regard to matters which are not *exclusively* university affairs. [Citations.] There can be no question that the loyalty of teachers at the university is not *merely* a matter involving the internal affairs of that institution but is a subject of general statewide concern." (*Tolman, supra*, 39 Cal.2d at p. 712, italics added.) Although the court in *Tolman* did not specify what matters are "exclusively university affairs" and subject to the University's constitutional autonomy, its holding presumes that such matters exist.

The Supreme Court again addressed the issue of legislative control over the University of California in *Regents of University of Cal. v. Superior Court of Alameda County* (1976) 17 Cal.3d 533 (*Alameda*). In that case, the court held the University to be

16

subject to state usury laws when using its endowment funds to make secured loans to individuals.  (*Id.* at p. 537.)  The high court reasoned that by lending money in the commercial market, the University was "acting in a capacity no different" than a private individual or corporation and was therefore subject to usury laws applicable to "any person company or corporation."  (*Id.* at pp. 536, 537.)  Although the court did not discuss the distinction it had made in *Tolman* between matters of "statewide concern" and "university affairs," nor did it expressly mention article IX, section 9, it did address "the question whether application of the usury laws to the University would infringe upon sovereign governmental powers."  (*Alameda, supra*, at p. 536.)  The court concluded there was no such infringement, but found it unnecessary to "define precisely the extent of immunity, if any, which the University enjoys."  (*Ibid.*)

More than 20 years after *Tolman*, the California Supreme Court revisited the distinction it had made between matters of "statewide concern" and "university affairs" by identifying one area of permissible legislative control over the University as follows: "[L]egislation regulating public agency activity not generally applicable to the public may be made applicable to the university when the legislation regulates matters of statewide concern not involving internal university affairs.  [Citation.]"  (*Labor Council, supra*, 26 Cal.3d at p. 789.)  The court went on to conclude that a prevailing wage requirement was a matter of local, rather than statewide concern, under case law reserving to charter cities and counties the power to determine wages paid to their employees.  (*Id.* at p. 790.)  Applying this principle to the University, the court determined that "[s]alary determination is as important to the autonomy of the university as it is to the independence of chartered cities and counties."  (*Id.* at p. 791.)

After *Labor Council*, courts of appeal have sought to define the boundaries of legislative control over the University by identifying those matters that are "of statewide concern" and those that involve "internal university affairs."  In *Coutin v. Lucas* (1990) 220 Cal.App.3d 1016 (*Coutin*), the court considered the validity of the Legislature's repeal of a statute designating the Chief Justice of California as president of the board of directors of Hastings College of the Law.  The appellant in *Coutin* claimed that the

17

legislative action violated article IX, section 9 because it interfered with the "internal governance" of the university.  (*Coutin*, at p. 1020.)  The court in *Coutin* disagreed, concluding that the legislative action involved a matter of statewide concern:  "It seems to us clear that the determination to eliminate the requirement that the Chief Justice of the state serve as president of the board of trustees of Hastings addresses a matter of statewide concern . . . .  [U]nlike altering the size of the board or adding a student to the board, a legislative determination that the Chief Justice of California should not be involved with nonjudicial duties in a nonjudicial public entity, surely constitutes matters of transcending statewide concern, and is patently not '"merely a matter involving the internal affairs of [the university].""'"  (*Id.* at p. 1026.)

The court in *Coutin* also sought to reconcile the differences in language used by the Supreme Court in *Tolman* and in *Labor Council* to define the limits of legislative control over the University:  "The phrasing of the limitation in [*Labor Council*], as matters of statewide concern 'not involving internal university affairs'. . . does not mean that the university or one of its colleges is immune from the effects of legislation of paramount state concern merely because that legislation may in some fashion affect the institution's internal affairs.  The Supreme Court in [*Labor Council*] relied upon [*Tolman*] as authority for this formulation of an area of legitimate legislation regulation.  *Tolman* recognized the hegemony of the legislature in matters of statewide concern 'which are not exclusively university affairs.'  [Citation.]  *Tolman* nowhere indicates that legislation on matters of manifest statewide concern will be inapplicable to the university merely because it also relates to the internal affairs of the university.  Indeed, the impact of *Tolman* is that legislation on subjects of general statewide importance applies to the university *unless* the matter is *exclusively internal* to the university.  [Citations.]"  (*Coutin, supra*, 220 Cal.App.3d at p. 1026.)

The court in *Coutin* then applied one commentator's suggested approach for determining what matters constitute "exclusively University affairs" within the  Regents' exclusive governing powers, using the following three factors:  "'"(1) the centrality of the subject matter to the functioning of the University as a university; (2) the degree of

18

impairment of the Regents' 'full' powers of governance; and (3) the interest advanced by the legislative enactment.' (Horowitz, *supra*, 25 UCLA L.Rev. at p. 36.)" (*Coutin, supra*, 220 Cal.App.3d at p. 1027.) The court concluded: "Analyzing the matter in this manner, we can readily observe that elimination of the designation of the Chief Justice to serve ex officio as president of the board of Hastings is not exclusively an internal affair of Hastings. Moreover, repeal of that legislation does not affect significantly, if at all, the administration of Hastings or its academic activities. Nor, as far as we can see, does it significantly affect internal governance of Hastings." (*Ibid.*)

Other courts have sought to establish the boundaries of legislative regulation over the University by identifying those matters that are exclusively university affairs. Courts have recognized, for example, that "the evaluation of scholarship and the grant or denial of tenure or promotion, unlike the ascertainment of loyalty, is a defining act of singular importance to an academic institution," precluding application of a statute that would require the University to disclose documents generated during the faculty peer review process. (*Scharf v. Regents of University of California* (1991) 234 Cal.App.3d 1393, 1405, fn. omitted.) Courts have refused to apply a statutory ban against the corporate practice of medicine because doing so "would infringe upon the operation of [the University's] medical center as a teaching and research facility -- its core governmental function, its *raison d'etre*. [Citations.]" (*California Medical Assn. v. Regents of University of California* (2000) 79 Cal.App.4th 542, 548, fn. omitted.) Courts have also concluded that a University construction project for student and staff housing was an internal university affair not subject to state prevailing wage laws because "[e]nsuring access to qualified students who otherwise could not attend, and securing the services of outstanding faculty and staff who otherwise might decline to accept or continue employment, is at the heart of UC's educational function . . . ." (*Regents of University of California v. Aubry, supra*, 42 Cal.App.4th at p. 590.)

19

**2. This contract does not involve a matter of statewide concern and its application impinges upon exclusively internal University affairs**

Under the principles set forth above, we cannot conclude that section 1090 as applied to the University in the circumstances presented here involves a matter of statewide concern. Determining what policies and procedures should govern conflicts of interest in the University's decisions to hire program assistants for a four-week summer study abroad course is not a matter of "transcending statewide concern." (*Coutin, supra*, 220 Cal.App.3d at p. 1026.)

Application of section 1090 to criminally sanction Lofchie infringes upon the Regents' and the University's exclusive powers of self-governance. In the exercise of its "full powers of organization and government" (Cal. Const., art. IX, § 9), the University has adopted detailed conflict of interest policies, including policies and procedures governing the employment of relatives and near relatives of University employees.[9] Among these policies is a general restriction on staff participation in employment decisions involving a spouse or other near relative. The policy states: "A member of the University staff shall not participate in the processes of review and decision-making on any matter concerning appointment, promotion, salary, retention, or termination of a near relative." Violation of the University's conflict of interest policy is also a violation of the University's faculty code of conduct and subjects the violator to potential discipline, including written censure, suspension without pay, demotion, or dismissal. The University's policies accord its administration flexibility, however, in determining whether a violation has occurred and in sanctioning any violation. Disputes over the existence of a violation, or appropriate discipline, are "resolved on a case-by-case basis."

The University concluded that Lofchie's participation in the decision to hire Comras as a summer study abroad program assistant did not constitute a violation warranting discipline under its conflict of interest policy and its faculty code of conduct.

---

[9] We granted the Regents' request that we take judicial notice of the University's conflict of interest code, faculty code of conduct, code of ethics, and its policies, guidelines, and personnel manuals implementing those codes.

Allowing the People to sanction Lofchie under section 1090 would infringe upon not only the University's conflict of interest policies, but its internal disciplinary policies as well. These policies "enjoy a status equivalent to that of state statutes. [Citation.]" (*Regents of University of California v. City of Santa Monica, supra*, 77 Cal.App.3d at p. 135.) Their impairment would substantially interfere with the Regents' full powers of governance over University affairs.

Moreover, it is far from clear whether applying section 1090 to the University in the circumstances presented here would advance the legislative interests underlying the statute. As discussed, neither the plain language of section 1090 nor its legislative history contains an expression of intent to include the University of California within the ambit of the statute.

### 3. Municipal home rule cases do not apply

The People concede that section 1090 "unquestionably intrudes somewhat into the [University's] affairs," but argue that such intrusion does not preclude the statute's application. They claim the instant case is analogous to municipal "home rule" cases determining when a state statute preempts an ordinance adopted by a charter city or county and urge us to adopt the analysis courts have applied in such cases to distinguish between "municipal affairs" and matters of "statewide concern."

Charter cities have powers of self-governance similar to those held by the University of California, in that they "are specifically authorized by our state Constitution to govern themselves, free of state legislative intrusion, as to those matters deemed municipal affairs." (*State Building & Construction Trades Council of California v. City of Vista* (2012) 54 Cal.4th 547, 555 (*State Building*).) Article XI, section 5, subdivision (a) of the California Constitution provides: "It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws. City charters adopted pursuant to this Constitution shall supersede any

21

existing charter, and with respect to municipal affairs shall supersede all laws inconsistent therewith."

The California Supreme Court has set forth the following four-part analysis for determining whether or not a matter falls within a charter city's constitutional home rule authority: "First, a court must determine whether the city ordinance at issue regulates an activity that can be characterized as a 'municipal affair.' [Citation.] Second, the court 'must satisfy itself that the case presents an actual conflict between [local and state law].' [Citation.] Third, the court must decide whether the state law addresses a matter of 'statewide concern.' [Citation.] Finally, the court must determine whether the law is 'reasonably related to . . . resolution' of that concern [citation] and 'narrowly tailored' to avoid unnecessary interference in local governance [citation]. 'If . . . the court is persuaded that the subject of the state statute is one of statewide concern and that the statute is reasonably related to its resolution [and not unduly broad in its sweep], then the conflicting charter city measure ceases to be a "municipal affair" pro tanto and the Legislature is not prohibited by article XI, section 5(a), from addressing the statewide dimension by its own tailored enactments.' [Citation.]" (*State Building, supra*, 54 Cal.4th at p. 556, quoting *California Federal Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1, 16, 17, 24 (*California Federal*).)

The People urge us to apply the municipal home rule analysis to this case to determine whether section 1090 addresses a matter of "statewide concern" and therefore supplants the University's powers of self-governance over "internal university affairs." Because the constitutional autonomy granted to the University under article IX, section 9 is substantially greater than that accorded to charter cities under article XI, section 5, we decline to do so.

Article XI, section 5 of the California Constitution grants charter cities sovereignty over matters deemed to be "municipal affairs," but recognizes state legislative supremacy over matters not within the ambit of that phrase. (*California Federal, supra*, 54 Cal.3d at p. 13.) It expressly states that "in respect to other matters," charter cities "shall be subject to general laws." (Cal. Const., art. XI, § 5(a).) Even as to matters

22

involving "municipal affairs," a charter city's enactments supersede only those state laws that are "inconsistent therewith." (*Ibid*.) In contrast, article IX, section 9 limits legislative control over the University to three areas -- fund security, endowment terms, and competitive bidding -- and grants the University "full powers" of governance in all other areas. (Cal. Const., art. IX, § 9.) The University's policies concerning matters of internal regulation "enjoy a status equivalent to that of state statutes" (*Regents of University of California v. City of Santa Monica, supra*, 77 Cal.App.3d at p. 135), and unlike charter city enactments, need not be "inconsistent" with a state law in order to supplant that law. As one commentator has observed, "although the general approach in some of the municipal affairs cases suggests elements of an approach to interpretation of article IX, section 9, the conclusion does not follow that decisions about the scope of 'municipal affairs' would necessarily define the scope of 'University affairs.'" (Horowitz, *supra*, 25 UCLA L.Rev. at p. 36.) This is because "a decision that a matter is not a municipal affair because of the need for uniformity in regulation of the matter throughout the state" has little potential relevance to article IX, section 9, which "by definition contemplates that regulation of an exclusively University affair by the Regents may differ from regulation by the Legislature of that matter as applied other than to the University." (Horowitz, at p. 36.) The municipal home rule analysis is therefore inapplicable to the University of California.

## CONCLUSION

The matter presented here is not one of statewide concern. Allowing the People to prosecute Lofchie under section 1090 would impair the Regents' ability to govern and would contravene article IX section 9 of the California Constitution.[10]

---

**10** In view of our holding, we need not address Lofchie's arguments that the information is barred because section 1090 is unconstitutionally vague as applied to him or that we should apply the rule of lenity to preclude criminal prosecution in this case. (See *Dunn v. United States* (1979) 442 U.S. 100, 112 ["to ensure that a legislature speaks with special clarity when marking the boundaries of criminal conduct, courts must decline to impose punishment for actions that are not 'plainly and unmistakably' proscribed"].)

**DISPOSITION**

The order dismissing the information is affirmed.

**CERTIFIED FOR PUBLICATION**


_____, J.
CHAVEZ


We concur:


_____, P. J.
BOREN


_____, J.*
FERNS

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.