Filed 6/13/23  P. v. Carrillo CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CARLOS CARRILLO,<br><br>Defendant and Appellant. | F082708<br><br>(Super. Ct. No. BF180529A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Kenneth C. Twisselman II, Judge.

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Christopher J. Rench and Cameron M. Goodman, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

### INTRODUCTION

Defendant Carlos Carrillo was involved in a drive-by shooting and later arrested during a traffic stop.  His residence was searched with a warrant.  Identification

belonging to defendant was discovered in the northwest bedroom, along with drugs, packaging equipment, and weapons.

Defendant was convicted of first degree murder (Pen. Code, § 187, subd. (a),[1] count 1), and the jury found true an allegation he discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)) and a special circumstance allegation that the murder was perpetrated by discharging a firearm from a motor vehicle with intent to inflict death (§ 190.2, subd. (a)(21)); two counts of assault with a firearm (§ 245, subd. (a)(2), counts 2 and 3) with an allegation that he personally used a firearm in both counts (§ 12022.5, subd. (a)); discharge of a firearm at a motor vehicle (§ 246, count 4) with a firearm allegation (§ 12022.53, subd. (d)); two counts of unlawful possession of a firearm by a prohibited person (§ 29805, counts 5 and 6); and possession for sale of cocaine (Health & Saf. Code, § 11351, count 7) and methamphetamine (Health & Saf. Code, § 11378, count 8).

On April 23, 2021, defendant was sentenced to: life without the possibility of parole for count 1, plus 25 years to life for the firearm enhancement; the upper term of four years for count 2, plus the upper term of 10 years for the firearm enhancement; 1 year (one-third the middle term) for count 3, plus one year, four months (one-third the middle term) for the firearm enhancement; the upper term of seven years for count 4, plus 25 years to life for the firearm enhancement, stayed pursuant to section 654; eight months (one-third the middle term) for count 5; a concurrent upper term of three years for count 6; one year (one-third the middle term) for count 7; and a concurrent upper term of three years for count 8. For an aggregate term of life without the possibility of parole plus 25 years to life and a determinate term of 18 years.

On appeal, defendant challenges his murder, assault with a firearm, and shooting at an occupied motor vehicle convictions (counts 1–4), contending there is insufficient

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

evidence he was the shooter. Defendant also challenges his convictions for counts 5–8, asserting the trial court prejudicially erred by admitting defendant's mother's out of court statement that defendant used the northwest bedroom, where contraband was found. In supplemental briefing, defendant contends the matter should be remanded for resentencing under Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill 567) and Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Assembly Bill 518). The People contend the evidence supporting the convictions is sufficient, the trial court did not err in allowing the out-of-court statement into evidence, and the matter does not need to be remanded because any error in sentencing was harmless.

We conclude the matter must be remanded for resentencing but otherwise affirm the judgment.

## FACTUAL BACKGROUND

Adrian S. and his cousin Arturo G. were hanging out on June 16, 2019, at Arturo's stepmother's house. Adrian's friend Pablo S. came over around 11:00 p.m. After about 10 minutes, the three of them got into Arturo's single-cab pick-up truck; Arturo was going to drop Pablo and Adrian off at their houses. Arturo got into the driver's seat, Adrian got into the bed of the truck, and Pablo got into the passenger seat.

As they were pulling up to Adrian's house, Adrian noticed a gray four-door Honda pulling up next to the driver's side of Arturo's truck. Adrian thought it might be his sister's car. Adrian could see the passenger side of the Honda and noticed the front passenger window was down and the back passenger window was up.

Adrian could not see anyone in the Honda, but he heard about five or six gunshots after the car pulled up next to them. Adrian testified he did not see the shooter's face or arm and did not recall seeing a gun. He assumed there were two people in the Honda, a driver and a passenger, and could not see anyone else. Once they heard the gunshots, Adrian, Arturo, and Pablo jumped out of the truck and ran. At trial, Adrian could not remember what happened during the shooting because it happened so quick and was

3.

overwhelming.  When he got out of the truck, Adrian and Pablo ran towards the side of Adrian's house and into the bushes.  Adrian did not see the truck after he exited it, did not recall what the Honda did after he left the truck, and did not know whether the vehicles collided.  He did not remember if anyone fell out of the Honda and hit the curb.  Adrian noticed the truck had stopped in front of his neighbor's house across the street.

Adrian found Arturo laying on the ground on the other side of a neighbor's fence he must have jumped over.  Arturo had been shot on the left side of his body and was trying to catch his breath.  Adrian saw blood on Arturo; he held Arturo in his arms until the police came.

At trial, Adrian did not remember if he spoke with police that night.  Adrian said he felt overwhelmed, heartbroken, sad, scared and was shaking.  Adrian remembered going to the police station the next day with his mother and speaking with a detective, but did not recall what he said.  Adrian acknowledged he had appeared in court because he was on a monitor for his previous failure to appear under subpoena.  He also testified he was not familiar with defendant and had never seen him before that day or outside the court proceedings.

During the trial, Adrian was shown a video from the night of the incident and a recording of the interview he had the next day at the Delano police station.  Adrian positively identified himself and his voice in the recording.  The video of the interview was played for the jury.

Adrian told the detective, when the Honda pulled up next to them, "they said what's up, and we say what's up because we thought we knew him."  Adrian said then the shooter "pulled the gun out." When Adrian saw the gun he went back down in the truck bed and then heard shots being fired.  The shooter had a black short-sleeved shirt on, no visible tattoos on his arm, and his skin tone was "a little bit lighter than mine." Adrian explained, when they got out of the truck, Arturo did not put it in park and the truck kept moving.  The Honda hit the back of the truck on the driver's side, but it did not

4.

block it. The Honda "tried going so they um, I guess the guy had opened the door but it was, the passenger the one who shot." "He had opened the door and the driver [of the Honda] didn't see so he stepped on it … with the door open the passenger flew out when I was ready, I looked, I seen the guy flew out and I just took off, I took off and went and hid in the bush and then … I heard … them say um, get up Charlie, I heard his name they're like get up Charlie, get up Charlie." Adrian said he saw the guy who fell out of the car hit his head on the corner of the sidewalk. Adrian's mother saw another guy get out of the car, pick up the person that fell off the curb, put him in the car, and then the car took off.

V.M., Arturo's stepmother, spoke with Adrian when she arrived at the scene of the shooting. She testified Adrian also told her he heard the other guys in the car say, "Get up, Charlie," or "Get in, Charlie." V.M. said the name "Charlie Brown" came to mind. V.M. went to school with defendant who always went by the name "Charlie."

Delano Police Officer Christopher Alfors was dispatched to the scene. When he arrived, he first went to the backyard to help Officer Raymond Sanchez provide aid to Arturo. Arturo could not verbally respond and was trying to catch his breath. Officer Alfors noticed a puncture wound around Arturo's left hip area. Officer Alfors then returned to the street and spoke with Adrian, but he did not conduct an in-depth interview; Adrian was excited. Adrian told Alfors that he, Pablo, and Arturo had come from Arturo's stepmother's house. Arturo was driving the truck and Adrian was "the middle passenger." He said the truck stopped and he noticed a four-door gray Honda approach. He heard a male from the Honda yell "what's up" to Arturo and Arturo responded, "what's up." Adrian then heard about five to six gunshots. He saw the shooter hold a silver handgun. Arturo jumped out of the truck, which was still in drive. Then, the Honda pulled in front of the truck, the truck struck the back of the Honda, and the truck ended up in a front yard. The Honda reversed and the passenger of the Honda

5.

fell out and hit the curb. Only one person fell out of the Honda. Adrian did not see anyone else.

Officer Javier Sanchez, a community service officer who assists detectives in processing crime scenes, was called to the scene. He found six empty brass casings at the scene of the shooting. From observing the head stamp on the casings, he was able to identify the brand was "Win" for Winchester, the caliber was 40, and the model was "S&W" for Smith & Wesson. There were blood drops or stains on the curb next to 2322 Rounds Street. Sanchez swabbed the blood stains to preserve the evidence. Sanchez located a white truck on the front yard of 2309 Rounds Street and observed five "projectile" entry holes on the driver side door. Inside the truck he found bullet fragments as well as a wallet with Arturo G.'s driver's license. No gun was located inside the truck. Sanchez was able to retrieve surveillance video from multiple neighboring homes.

Doctor Eugene Carpenter, coroner for the Kern County Sheriff's Office, conducted the autopsy for Arturo and found six gunshot wounds to his lower left body, which caused his death. Carpenter opined the bullet wounds were characteristic of a large caliber handgun and not consistent with a high-velocity weapon like a rifle.

Expert criminologist Kelly Woolard explained a nine-millimeter handgun would not be able to shoot a .40-caliber bullet. Woolard determined that all six casings located at the scene were fired from the same firearm. Brooke Ramirez worked for the Kern County Regional Crime Laboratory as a DNA analyst. It was determined that the DNA sample of the blood from the curb at the crime scene came from the same source as the DNA sample taken from defendant.

A video depicting the incident was admitted and played for the jury. Acting Corporal Antonio Alvarez explained that in the video he noticed at least two flashes of light coming from the passenger's side of the vehicle on the left, which he explained were muzzle flashes. Alvarez interviewed Adrian at the police station. Because Adrian said

6.

the suspect shooter had fallen out of the vehicle and hit his head near the east curb of Rounds Street, Alvarez returned to the scene where he discovered what appeared to be blood on the curb line at the scene of the shooting. Alvarez collected a buccal swab from defendant for DNA evidence. Alvarez testified the murder weapon was not recovered.

On March 24, 2020, defendant was arrested subsequent to a traffic stop. Defendant had two cell phones, a small baggie of marijuana, and a wallet with a large amount of money in it on him when he was arrested. Detective Santos obtained a search warrant and searched defendant's residence at 1020 Norwalk Street. The house had three bedrooms and a bed in the living room.

Before the police searched the residence, defendant's mother informed them defendant's bedroom was in the northwest corner of the house. When Detective Santos searched the northwest bedroom, he found defendant's driver's license, which also led him to believe it was defendant's bedroom. Detective Santos also discovered two baggies of cocaine, weighing 7.41 grams and 1.74 grams, 10.64 grams of methamphetamine, a bag containing marijuana, two empty baggies that smelled like marijuana, pay-owe sheets, digital scales, large amounts of cash, and baggies with numbers on them. Santos opined the drugs were possessed for sale. Two handguns were also discovered in the northwest bedroom: a Glock 19 nine-millimeter and a Springfield Armory XDM nine-millimeter. Officer Sanchez took photos of the house, including the northwest bedroom. Detective Santos photographed mail with the name C. Carrillo and Carlos Carrillo on it. In the northwest bedroom, Officer Sanchez found a driver's license with the name Carlos Carrillo on it, as well as a social security card for Carlos Carrillo inside the drawer of a nightstand.

Defendant was charged with first degree murder of Arturo G. (§ 187, subd. (a), count 1) with an allegation he personally and intentionally discharged a firearm, causing great bodily injury or death (§ 12022.53, subd. (d)) and a special circumstance allegation that the murder was perpetrated by discharging a firearm from a motor vehicle with intent

7.

to inflict death (§ 190.2, subd. (a)(21)); assault with a firearm against Adrian (§ 245, subd. (a)(2), count 2) and against Pablo (§ 245, subd. (a)(2), count 3) on June 16, 2019, each with allegations that he personally used a firearm during both counts (§ 12022.5, subd. (a)); discharge of a firearm at a motor vehicle occupied by Arturo G. on June 16, 2019 (§ 246, count 4) with a firearm allegation (§ 12022.53, subd. (d)).[2] Defendant was also charged with being a prohibited person in possession of a firearm, a Springfield Armory nine-millimeter pistol (§ 29805) and a Glock 19 pistol (§ 29805) on March 24, 2020 (counts 5 and 6); possession for sale of cocaine (Health & Saf. Code, § 11351, count 7) and methamphetamine (Health & Saf. Code, § 11378, count 8) on March 24, 2020.[3]

Defendant stipulated that he was previously convicted of a violation of section 422 on or about March 11, 2011, and that such conviction was within 10 years that he allegedly possessed the firearm under counts 8 and 9.

The jury found defendant guilty of all counts and allegations as charged. The court sentenced defendant on count 1, to life imprisonment without the possibility of parole, plus 25 years to life under section 12022.53, subdivision (d), and a consecutive determinate sentence of 18 years comprised of the upper term of four years for count 2 and 10 years for the section 12022.5, subdivision (a) firearm enhancement associated with count 2, plus one year (one third the middle term) for count 3 and one year, four months (one third the middle term) for the section 12022.5, subdivision (a) firearm enhancement associated with count 3, plus the upper term of seven years for count 4 and 25 years to life for the section 12022.53, subdivision (d) enhancement (stayed pursuant to

---

**2** The People dismissed the section 12022.7, subdivision (a) enhancement attached to the section 246 charge.

**3** Defendant was also charged with gang enhancements (§ 186.22, subd. (b)(1)) on counts 5 through 8. The court bifurcated the gang allegations and, before the bifurcated portion of the trial on the gang enhancements was held, the court granted the People's request to dismiss these enhancements.

section 654), plus eight months (one third the middle term) for count 5, plus the upper term of three years for count 6, which is to be served concurrent to count 5, plus one year (one third the middle term) for count 7, and the upper term of three years for count 8, which was ordered to be served concurrently with the sentence on count 7.

## DISCUSSION

I.    SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S FINDING THAT DEFENDANT WAS THE SHOOTER, SUPPORTING HIS CONVICTIONS FOR COUNTS 1 THROUGH 4.

Defendant claims the evidence at trial failed to prove he was the shooter and "was insufficient as a matter of law to convict [him] of counts 1-4." The People disagree, noting that DNA evidence, the surveillance video, and Adrian's testimony all point to defendant as the shooter. We agree with the People.

### A.    Relevant Factual and Procedural History

Defendant's counsel conceded during opening statements that the evidence, specifically the DNA evidence, would show defendant was the person who fell from the Honda and struck his head on the curb. Defense counsel argued, there is "a difference between being the shooter and being present." In closing arguments, defense counsel again conceded defendant was present at the scene based on the DNA evidence, but argued he was not the shooter. "Defense has never asserted or argued or put forth that he wasn't there. His DNA is there, so he was there."

As discussed, Adrian detailed the shooting incident in an interview with police. With regard to the events that took place right after Adrian heard shots, he explained, in relevant part:

> "[ADRIAN]: But I guess it was low, his car's really low so he hit curb and um, once the driver saw us we all got out of the truck and threw (unintelligible) so it was moving, so it was moving and it hit the back of truck on the driver side, but it didn't hit it enough to block it in. So it got lose they (unintelligible) tried going so they um, I guess the guy had opened the door but it was, the passenger the one who shot.

9.

"DETECTIVE: Mhm.

"[ADRIAN]: He had opened the door and the driver didn't see so he stepped on it, he stepped on it with the door open the passenger flew out when I was ready, I looked, I seen the guy flew out and I just took off, I took off and went and hid in the bush and then um, and then, I heard, I head [*sic*] them say um, get up Charlie, I heard his name they're like get up Charlie, get up Charlie. And um, I guess my mom when she was out cause she took and (unintelligible) and I said go inside, go inside and she said she seen a guy get out of the car pick him up and put him in the car. And um, and they, they took off …."

B.     Standard of Review and Applicable Law

The relevant question on review of the sufficiency of the evidence to support a criminal conviction is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319; *People v. Johnson* (1980) 26 Cal.3d 557, 576 [same]; *People v. Zaragoza* (2016) 1 Cal.5th 21, 44.) In making this determination, the appellate court " 'must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citations.] ... '[O]ur task ... is twofold. First, we must resolve the issue in the light of the *whole record* …. Second, we must judge whether the evidence of each of the essential elements ... is *substantial* ….' " (*People v. Johnson*, *supra*, at pp. 576–577.)

" 'Although the appellate court must ensure the evidence is reasonable in nature, credible, and of solid value (*People v. Johnson*, *supra*, 26 Cal.3d at p. 576), it must be ever cognizant that " 'it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends ....' " (*People v. Thornton* (1974) 11 Cal.3d 738, 754 …, disapproved on other grounds, *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [ ].)' " (*People v. Young* (1987) 190 Cal.App.3d 248, 254–255.) "Moreover, unless the testimony is physically

impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

"Thus, if the verdict is supported by substantial evidence, this court must accord due deference to the trier of fact and not substitute its evaluation of a witness's credibility for that of the fact-finder. (*People v. Samuel* (1981) 29 Cal.3d 489, 505 [ ]; *People v. Kerr* (1951) 37 Cal.2d 11, 15 [ ].)" (*People v. Barnes* (1986) 42 Cal.3d 284, 303–304.) A conviction will only be reversed where the evidence "is so fraught with uncertainty as to preclude a confident determination of guilt beyond a reasonable doubt." (*People v. Reyes* (1974) 12 Cal.3d 486, 500; *People v. Manibusan* (2013) 58 Cal.4th 40, 87 [reversal improper unless no conceivable theory provides substantial evidentiary support for the jury's verdict].)

C.     Analysis

Defendant only challenges counts 1 through 4 on the grounds there was insufficient evidence he was the shooter. Defendant argues that Adrian's statements did not clearly indicate the man who fell out of the Honda was the shooter. Defendant claims that Adrian's statement, "I guess the guy had opened the door but it was, the passenger the one who shot" amounts to speculation and "is not clear enough to amount to substantial evidence that [defendant] was the shooter." Defendant contends there was no other evidence showing he was the shooter. The People contend that there was a "powerful body of evidence" at trial that defendant "was the lone shooter who targeted Arturo and the occupants of his truck." They argue the surveillance footage, coupled with Adrian's statements, established the shooter was the passenger in the Honda, and Adrian's statements established the same passenger of the Honda who fell out and hit his head on the curb was the shooter. We agree with the People and conclude substantial evidence in the record supports the jury's determination that defendant was the shooter.

11.

First, defendant concedes the evidence established he was the person who fell out of the Honda. Indeed, the DNA evidence collected from the blood on the curb matched the DNA sample taken from defendant. Further, Adrian told Officer Alfors that the passenger of the Honda fell out and hit the curb. Adrian told Alfors that only one person fell out of the Honda. Adrian heard someone from inside the Honda call out to the passenger who fell and hit his head on the curb, calling him "Charlie." V.M. said she went to school with defendant who always went by the name "Charlie." Accordingly, it is undisputed that sufficient evidence supports a conclusion defendant was the passenger who fell out of the Honda and hit his head on the curb.

Next, there is substantial evidence from which a rational trier of fact could conclude the person who fell out of the Honda and hit his head on the curb—namely, defendant—was the shooter. Adrian identified the shooter as the front passenger of the gray Honda, explaining the front passenger window of the Honda was rolled down, while the back passenger window was up. He told Alfors that it was the passenger who pulled out a gun and shot five or six times. Video evidence depicted muzzle flashes coming from the passenger side of the Honda, also supporting the conclusion that the shooter was on the passenger side. The six casings collected from the scene came from the same firearm, suggesting there was only one shooter. And Adrian explained, after the Honda hit Arturo's truck, "I guess the guy had opened the door but it was, the passenger the one who shot." Adrian continued, "[h]e had opened the door and the driver didn't see so he stepped on it, he stepped on it with the door open the passenger flew out …." We conclude the cited testimony and evidence provide substantial evidence from which the jury could conclude Adrian identified the passenger who fell out of the car—who, based on the DNA evidence, was defendant—was the shooter. (See *People v. Zaragoza, supra,* 1 Cal.5th at p. 45 [noting "[t]he evidence that defendant was the shooter was entirely circumstantial—but it was sufficiently substantial to uphold his convictions"].)

12.

Though Adrian testified defendant's skin tone appeared darker at trial than Adrian's and Adrian described the skin tone of the shooter's arm as being a little lighter than his following the incident, this is "merely [a] discrepanc[y] in the evidence the jury considered and resolved against defendant." (*People v. Hill* (1998) 17 Cal.4th 800, 849; see also *People v. Soldavini* (1941) 45 Cal.App.2d 460, 462 ["'In order to sustain a conviction it is not necessary that the identification of the defendant as the perpetrator of the crime be made positively or in a manner free from inconsistencies.'"].) And we disagree with defendant's contention that Adrian's statement, "I guess the guy had opened the door but it was, the passenger who shot," was unclear or reflected that Adrian was "speculating" given his use of the phrase "I guess," such that the statement could not constitute substantial evidence in support of defendant's convictions. Rather, the jurors were tasked with weighing and interpreting the evidence and " '[w]e do not reweigh evidence or revaluate a witness's credibility.' " (See *People v. Brown* (2014) 59 Cal.4th 86, 106.) And, here, a reasonable juror could construe Adrian's statement "the passenger the one who shot" as substantial evidence identifying the shooter as the person who fell out of the Honda. (See *People v. Hill*, *supra*, at p. 850 ["That the evidence could be consistent with other possible scenarios is irrelevant, however, so long as there was substantial evidence from which a rational trier of fact could have found defendant" committed the charged offense]; see generally *People v. Mohamed* (2011) 201 Cal.App.4th 515, 522 [" '[I]t is not essential that a witness be free from doubt as to one's identity. He may testify that in his belief, opinion or judgment the accused is the person who perpetrated the crime, and the want of positiveness goes only to the weight of the testimony.' "].)

We also disagree with defendant's position that this is a case where it is unknown whether defendant or another occupant of the Honda was the shooter. Defendant cites to *People v. Botello* (2010) 183 Cal.App.4th 1014, 1022 and *People v. Allen* (1985) 165 Cal.App.3d 616, 626, where it was uncertain which of the two known defendants fired

13.

the gun. In both scenarios, the court ruled there was insufficient evidence to support the personal use/discharge of a firearm enhancement against either defendant. Here, there is no evidence that there was another passenger on the right side of the Honda that could have shot the gun and/or fallen out of the Honda.

Defendant's reliance on *People v. Smith* (2005) 135 Cal.App.4th 914, overruled on other grounds in *People v. Garcia* (2008) 168 Cal.App.4th 261, 291, is also misplaced. In *Smith*, the court held the evidence was insufficient to find the defendant was the actual killer or had the intent to kill when there was no testimony or forensic evidence that placed him in the room. (*Smith, supra,* at p. 927.) In contrast, here, Adrian, an eyewitness, reported that the shooter was the one who fell out of the Honda; there was no evidence of another passenger on the right side of the Honda; and it was undisputed that defendant was present during the shooting and is the person who fell out of the Honda from the passenger side.

Accordingly, reviewing the record in the light most favorable to the jury's verdict, substantial evidence supports the jury's finding that defendant was the shooter. (See *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Johnson, supra,* 26 Cal.3d at p. 578.) Thus, we reject defendant's challenges to his convictions of counts 1 through 4 on that basis.

II.     THE TRIAL COURT DID NOT PREJUDICIALLY ERR BY ADMITTING DEFENDANT'S MOTHER'S OUT OF COURT STATEMENT THAT THE NORTHWEST BEDROOM WAS DEFENDANT'S

Defendant contends the trial court prejudicially erred by admitting his mother's out of court statement that the northwest bedroom belonged to him. The People contend the court did not abuse its discretion because it only admitted the evidence for a limited purpose or, alternatively, any error was harmless because indicia of defendant's identity was present in the room where the drugs and firearms were discovered. We agree with the People.

14.

A.    Relevant Factual and Procedural History

Detective Santos testified that most items of evidentiary value were found in one bedroom, and when the prosecutor asked which bedroom, Santos replied, "Carlos Carrillo's bedroom, in the northwest corner." Defense counsel objected on foundation grounds, and the court told the prosecutor to lay a foundation. The following exchange then took place:

"[PROSECUTOR]: How did you know which bedroom belonged to Carlos Carrillo?

"[THE WITNESS]: Prior to searching the residence, Carlos Carrillo's mother, Maria, arrived on scene. I had Detective Moran talk to her and find out which bedroom was his. She stated that –

"[DEFENSE COUNSEL]: Objection. Hearsay, foundation.

"THE COURT: Is this for the truth or to explain conduct?

"[PROSECUTOR]: To explain where they searched and why.

"THE COURT: All right. So I am not going to allow the jury to consider what the mother told the officers for the truth of what was said. It's merely to explain their conduct. So it's limited to that purpose.

"Go ahead and finish your answer.

"THE WITNESS: She stated that he stayed in or slept in the northwest corner of the bedroom. And once we searched that bedroom—

"[DEFENSE COUNSEL]: Objection. Nonresponsive.

"THE COURT: Wait for a question now.

"[PROSECUTOR]: After obtaining that information from his mother, did you go to the northwest bedroom?

"THE WITNESS: Yes.

"[PROSECUTOR]: Did you see any information or material in that bedroom that would lead you to believe it was Carlos Carrillo's bedroom?

"THE WITNESS: Yes.

15.

"[PROSECUTOR]: What?

"THE WITNESS: There was a driver's license or identification card on the TV stand."

The prosecutor showed Detective Santos a picture of the bedroom, which the detective described as "the bedroom at the northwest corner where the mother told us that was Carlos Carrillo's bedroom." Defense counsel again made a hearsay objection. The trial court admonished the jury that the mother's statement was "not for the truth." The prosecutor then showed Detective Santos another photograph of defendant's identification card, which was found in the northwest bedroom. Later, when discussing the firearms and drugs found therein, Detective Santos referred to the "northwest bedroom" as "Carlos Carrillo's bedroom."

On cross-examination, Detective Santos testified defendant's brother also lived at the residence; no lock or deadbolt prevented entry into the northwest bedroom; and no inquiry had been made about when defendant was last inside the northwest bedroom. Detective Santos further disclosed on cross-examination that defendant's brother's identification was located in the south bedroom, along with cash.

B.     Standard of Review and Applicable Law

A trial court's evidentiary rulings are reviewed for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 717; *People v. Jones* (2013) 57 Cal.4th 899, 956 ["trial court's decision to admit or exclude a hearsay statement ... will not be disturbed on appeal absent a showing of abuse of discretion."]; *People v. Yates* (2018) 25 Cal.App.5th 474, 484 [appellate courts "review the court's evidentiary rulings—including those that turn on the hearsay nature of the evidence—for abuse of discretion …."].) A trial court's discretion to admit or to exclude evidence will be upheld on appeal unless the trial court acted " ' "in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Williams* (2008) 43 Cal.4th 584, 634-635.)

16.

Evidence Code section 1200 provides in relevant part: "(a) 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated [¶] (b) Except as provided by law, hearsay evidence is inadmissible."

Evidence not offered for the truth of the matter asserted is not barred by the hearsay rule. (*People v. Boyette* (2002) 29 Cal.4th 381, 429.) "[A]n out-of-court statement can be admitted for the nonhearsay purpose of showing that it imparted certain information to the hearer, and that the hearer, believing such information to be true, acted in conformity with such belief." (*People v. Montes* (2014) 58 Cal.4th 809, 863; *People v. Davis* (2005) 36 Cal.4th 510, 535-536 [an out-of-court statement is admissible if offered for something other than the truth of the matter asserted and is relevant to an issue in dispute].) "[T]he nonhearsay purpose [must also be] relevant to an issue in dispute." (*Davis, supra,* at p. 536; see Evid. Code, § 210 [defining relevant evidence].)

"As a general rule, the erroneous admission of hearsay evidence will not result in a reversal unless it is reasonably probable the defendant would have received a more favorable result had the evidence not been admitted." (*People v. Landau* (2016) 246 Cal.App.4th 850, 866, as modified on denial of reh'g (May 5, 2016), citing *Jones, supra,* 57 Cal.4th at p. 956; *People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Boyette, supra,* 29 Cal.4th at p. 429.)

C.     Analysis

Defendant contends, although the hearsay testimony regarding the location of defendant's bedroom was not offered for the truth of the matter asserted, the rationale for admitting this evidence was disingenuous since the evidence did not relate to a disputed or relevant issue. Defendant argues the evidence proving the northwest bedroom belonged to defendant was weak and therefore, the hearsay statement that it was his bedroom would have been significant to the jury despite the limiting instruction. The

17.

People contend the court did not abuse its discretion because it only admitted the evidence for a limited purpose. The People note that defendant forfeited any meritless federal constitutional claims by not objecting on these grounds at trial. Moreover, the People state that any error was harmless because indicia of defendant's identity were present in the room where the drugs and firearms were discovered. Finally, the People claim that defense counsel provided effective assistance in how she objected to the evidence. We conclude the trial court erred in admitting the hearsay statement but agree with the People that the error was harmless.

As defendant concedes, evidence not offered for the truth of the matter asserted is not barred by the hearsay rule. (*Boyette, supra,* 29 Cal.4th at p. 429.) Here, evidence of defendant's mother's statement was admitted only after defense counsel objected on foundation grounds when Detective Santos testified he searched defendant's bedroom, the northwest bedroom. Accordingly, the prosecutor asked Detective Santos why he believed the northwest bedroom belonged to defendant. Detective Santos then testified that defendant's mother "stated that he stayed in or slept in the northwest … bedroom." After the hearsay objection, the court allowed the statement with a limiting instruction that it was not admitted for the truth of the matter but to explain why the northwest bedroom was searched.

However, the nonhearsay purpose must also be relevant to an issue in dispute. (*People v. Armendariz* (1984) 37 Cal.3d 573, 586, superseded by statute on other grounds as stated in *People v. Cottle* (2006) 39 Cal.4th 246, 253; *Davis, supra,* 36 Cal.4th at p. 536.) In *Armendariz,* our Supreme Court stated a "hearsay objection to an out-of-court statement may not be overruled simply by identifying a nonhearsay purpose for admitting the statement. The trial court must also find that the nonhearsay purpose is relevant to an issue in dispute." (*Armendariz, supra,* at p. 585.) In *Armendariz*, the murder victim's request to his son to stay the night 17 months before the victim's death, because defendant demanded money and threatened to assault the victim, established why the son

18.

spent the night at the victim's house that night. Our Supreme Court ruled that the trial court's admission of hearsay testimony for the limited nonhearsay purpose of explaining why the murder victim's son went to the victim's house was erroneous because the alleged nonhearsay purpose of the testimony had no bearing whatsoever on any issue in the trial. (*Id*. at p. 586.) The Supreme Court warned that a "careful inquiry as to relevance is required." In *Armendariz,* "[s]uch inquiry show[ed] that [the victim]'s state of mind was not at issue in this case." (*Ibid*.)

Additionally, in *People v. Scalzi* (1981) 126 Cal.App.3d 901, the First District Court of Appeal, Division 3, found the nonhearsay purpose of proffered hearsay evidence not relevant to an issue in dispute. In *Scalzi,* the defendant, "John," was arrested when police officers found him at a residence with drugs and packaging equipment. While the officers were at the residence, and after defendant was arrested, the telephone rang. The officer answered the call and the caller asked if "John had gotten it bagged up." The defendant, John, did not live at the house but was the only John among the suspects in the house. (*Id*. at pp. 905–906.) The defense objected to the admission of the hearsay evidence of the telephone call, but the trial court allowed it, not for the truth of the matter, but "to furnish information to the witness as to what he did later." (*Scalzi*, *supra*, at p. 905.) On appeal, the People contended the declarations of the unknown caller were not hearsay evidence because they were not received to prove the truth, i.e., that "John" was there "bagging up." (*Id*. at p. 906.) They urged that "[t]he court properly reasoned that the testimony was circumstantial evidence relevant to explaining why [the officer] booked [the defendant] on those particular charges, since [the defendant] was not told what he was being arrested for until after the telephone conversations took place." (*Ibid*.) However, the appellate court disagreed. (*Ibid*.) First, it noted from the record that the defendant was informed by the officer that he was being arrested on an old warrant for allegedly leaking oil in the streets of Ukiah and a child non-support warrant. (*Ibid*.) "Only later during a jail house interview did [the officer] reveal that he harbored a belief

that [defendant] was conspiring to intentionally sell methamphetamine." (*Ibid.*) Second, it concluded the officer's "state of mind accounting for [defendant's] arrest, booking and charges was not an issue in the case, therefore irrelevant as a matter of law." (*Ibid.*) Therefore, the court held it was error to admit the police officer's testimony of the telephone conversation. (*Id.* at p. 907.) The court found that the asserted nonhearsay purpose, of showing the reason the police officer booked John on the drug charges, did not render the evidence admissible because the officer's reasons for charging the defendant with conspiracy to sell drugs were irrelevant. (*Ibid.*) "[The officer's] reaction or state of mind after the telephone conversation and any actions he took based thereon shed no light on any issues presented in the case. Anything [the officer] did in response to the telephone conversation was irrelevant." (*Ibid.*)

Applying the reasoning in *Scalzi* and *Armendariz,* we conclude here the trial court erred in admitting the officer's testimony that defendant's mother told the officers defendant "stayed in or slept in the northwest ... bedroom." We agree with defendant that the asserted nonhearsay purpose of explaining why the officers searched the northwest bedroom was irrelevant to the issues in this case. Their state of mind was not an issue in this case. Anything the officers did as a response to the mother's statement was irrelevant especially considering the officers searched the entire house, and therefore, there was no need to explain why one specific bedroom was searched. Since the articulated nonhearsay purpose of the statement was irrelevant to any disputed issue, the statement should have been excluded.

Nonetheless, we conclude the error was harmless. Here, there was evidence, independent of the hearsay statement, linking the northwest bedroom to defendant. When the officers searched the northwest bedroom, they discovered two separate forms of identification belonging to defendant. They found defendant's driver's license and his social security card. This evidence on its own effectively links defendant to the northwest bedroom, independent of the hearsay statement from defendant's mother. Of

further consideration is that identification belonging to defendant's brother was located in the southern bedroom, suggesting that defendant's brother occupied the south bedroom and not the northwest bedroom. Consequently, we conclude "it is [not] reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the [out of court statement]." (*Boyette*, *supra*, 29 Cal.4th at p. 429, quoting *People v. Watson*, *supra*, 46 Cal.2d at p. 836; *Landau, supra,* 246 Cal.App.4th at p. 866 [no reversal unless reasonably probable defendant would have received a more favorable result].)

We note defendant has forfeited his claims that his mother's out-of-court statement violated his right to confront witnesses under the Sixth and Fourteenth Amendments and that he was denied a fair trial. A judgment may not be reversed on appeal unless the trial record contains "an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion[.]" (Evid. Code, § 353, subd. (a).) Therefore, " ' "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable.' " (*People v. Partida* (2005) 37 Cal.4th 428, 433-434.)

Defense counsel objected to the out-of-court statement about defendant's bedroom as "[h]earsay" and lacking "foundation." Defense counsel did not raise an objection under the confrontation clause or other federal claims. Therefore, defendant's constitutional challenges have been forfeited on appeal.

Regardless, defendant's mother's statement regarding which room defendant stayed does not rise to the level of federal constitutional error. In *Crawford v. Washington* (2004) 541 U.S. 36, the United States Supreme Court held that the confrontation clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Id.* at pp. 53-54.) Only statements that are

21.

testimonial "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." (*Davis v. Washington* (2006) 547 U.S. 813, 821.)

"Although *Crawford* and its progeny have "not settled on a clear definition of what makes a statement testimonial, [our state Supreme Court has] discerned two requirements. First, 'the out-of-court statement must have been made with some degree of formality or solemnity.' [Citation]. Second, the primary purpose of the statement must 'pertain [ ] in some fashion to a criminal prosecution.' " (*People v. Gallardo* (2017) 18 Cal.App.5th 51, 66; see *People v. Lopez* (2012) 55 Cal.4th 569, 581; *People v. Morales* (2020) 44 Cal.App.5th 353, 360.) In *Morales,* the witness's statements were not " ' "sworn to by the declarant before an officer authorized to administer oaths," ' " nor "written down or formalized in any document signed by him." (*Morales, supra,* at pp. 362–363.) As such, the *Morales* court concluded the statements fell short of the formality requirement and did not invoke the Confrontation Clause. (*Ibid*.) Here, defendant's mother's statement indicating the bedroom where defendant stayed was even less formal. As such, it also falls short of the formality requirement and does not implicate the Confrontation Clause.

Last, since we determined the trial court's error in admitting the statement was harmless, defendant cannot establish he was prejudiced by any alleged failure of his counsel to object on this basis. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Ledesma* (1987) 43 Cal.3d 171, 217.) Nor can we conclude defendant was deprived of his right to a fair trial. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 227, 229.)

III.    SENATE BILL 567 AND ASSEMBLY BILL 518

Upon supplemental briefing, defendant contends that the matter should be remanded for resentencing due to changes in the law under Senate Bill 567 and Assembly Bill 518. The People contend that any error in sentencing after Senate Bill 567 is

harmless and that the special circumstance finding precludes any other possible stay under section 654. We conclude remand is required under Senate Bill 567.

A.     Relevant Factual Background

In sentencing defendant, the trial court made the following findings and orders:

"I don't find circumstances in mitigation. I find the following circumstances in aggravation: One, the Defendant has engaged in violent conduct, which indicates a serious danger to society, based on the current offenses, as well as his prior convictions. And I'd already previously described those when I exercised my discretion under 1385, as set forth on page 13 of the report.

"Two: The Defendant's prior convictions as an adult and sustained petitions in juvenile delinquency proceedings are numerous and increasing in seriousness.

"Three: The Defendant was on three grants of misdemeanor probation when the crime was committed.

"Four: The Defendant's prior performance on juvenile and adult probation was unsatisfactory in that he violated terms and reoffended."

In its justification for consecutive sentencing, the court stated: "I do agree that the consecutive sentencing was justified as to other counts in that the crimes in their objectives were predominantly independent of each other. That's number one; two, the crimes were committed at different times or separate places, rather than so closely in time and place as to indicate a single period of aberrant behavior; and three, the crimes involve separate acts of violence or threats of violence."

The trial court pronounced the sentence as follows:

"Count 1, probation is denied, the Defendant is sentenced to the Department of Corrections for the term prescribed by law of life without the possibility of parole. Said sentence enhanced by 25 years to life per Penal Code Section 12022.53 (d)…. [¶] … [¶] Count two, probation is denied. The Defendant is sentenced to the Department of Corrections for the upper term of four years. Said sentence enhanced by ten years per Penal Code Section 12022.5 (a). Said sentence to be served consecutive to the sentence imposed above.... [¶] … [¶] Count 3, probation is denied.

23.

The Defendant is sentenced to the Department of Corrections for the term of one year, which is one third of the mid-term. Said sentence to be enhanced by one year, four months, which is one third of that mid-term per Penal Code Section 12022.5 (a). Said sentence to be served consecutive to the sentence imposed above.... [¶] Count 4, probation is denied. The Defendant is sentenced to the Department of Corrections for the upper term of seven years. Said sentence enhanced by 25 years to life per Penal Code Section 12022.53 (d). Punishment for said sentence and enhancement stayed per Penal Code Section 654 until the successful completion of the sentence imposed above and permanently thereafter.... [¶] Count 5, probation is denied. The Defendant is sentenced to the Department of Corrections for the term of eight months, one third of the mid-term. Said sentence served consecutive to the sentence impose above.... [¶] ... [¶] Count 6, probation is denied. The Defendant is sentenced to the Department of Corrections for the upper term of three years. Said sentence to be served concurrent to the sentence imposed above.... [¶] ... [¶] Count 7, probation is denied. The Defendant is sentenced to the Department of Corrections for the term of one year, one third of the mid-term. Said sentence served consecutive to the sentence imposed above.... [¶] ... [¶] Count 8, probation is denied. The Defendant is sentenced to the Department of Corrections for the upper term of three years, said sentence to be served concurrent to the sentence imposed above. The Defendant's sentence is therefore an indeterminate term of life without the possibility of parole, plus 25 years to life, plus a determinate term of 18 years."

B.      Applicable Law and Standard of Review

Effective January 1, 2022, Senate Bill 567 amended section 1170, subdivision (b), making the middle term the presumptive sentence for a term of imprisonment unless certain circumstances exist. (*People v. Dunn* (2022) 81 Cal.App.5th 394, 402, review granted Oct. 12, 2022, S275655.) Penal Code section 1170, subdivision (b) now states in part:

"(1) When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2).

"(2) The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the

24.

defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial.…

"(3) Notwithstanding paragraphs (1) and (2), the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury. This paragraph does not apply to enhancements imposed on prior convictions."

Assembly Bill 518, which amended Penal Code section 654, also became effective January 1, 2022. "Section 654 precludes multiple punishments for a single act or indivisible course of conduct." (*People v. Hester* (2000) 22 Cal.4th 290, 294.) Under the previous version of section 654, it was required that an act or omission that was punishable in different ways by different laws be punished under the law that provides for the longest possible term of imprisonment. (§ 654, subd. (a).) However, Assembly Bill 518 amended section 654 to provide that an act or omission that is punishable in different ways by different laws may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision. (See § 654, subd. (a), as amended by Stats. 2021, ch. 441, § 1.) As such, the trial court is no longer required to impose punishment for the crime that carries the longest term of imprisonment, but now has discretion in deciding which term of punishment to impose.

We decide de novo the legal issue of whether defendant should benefit from the changes in the law. (See *People v. Lofchie* (2014) 229 Cal.App.4th 240, 250.)

C.    Analysis

When the Legislature amends a statute reducing punishment without stating whether it should be given retroactive effect, the new law applies in all cases in which the judgment is not yet final. (*In re Estrada* (1965) 63 Cal.2d 740, 742.) *Estrada's* retroactivity also applies where there are ameliorative changes in the law that provide a new opportunity for imposition of a lesser punishment. (See *People v. Frahs* (2020) 9 Cal.5th 618, 629–631 [*Estrada* requires retroactive application of new law providing a new opportunity for imposition of a lesser punishment—mental health diversion]; *People*

25.

*v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 308 [*Estrada* requires retroactive application of new law providing a new opportunity for imposition of a lesser punishment—a juvenile disposition]; *People v. Francis* (1969) 71 Cal.2d 66, 76–77 [*Estrada* requires retroactive application of new law providing an opportunity for imposition of a lesser punishment—misdemeanor sentencing].) Because both Senate Bill 567 and Assembly Bill 518 make a lesser punishment possible, and because the Legislature gave no indication it intended the changes to apply prospectively only, their ameliorative changes apply retroactively to nonfinal judgments. (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1039 [Sen. Bill 567 applies retroactively]; *People v. Lopez* (2022) 78 Cal.App.5th 459, 465 [same]; *People v. Garcia* (2022) 76 Cal.App.5th 887, 902 [same]; see *People v. Frahs*, *supra*, at p. 634; *In re Estrada*, *supra*, at p. 742; see also *People v. Mani* (2022) 74 Cal.App.5th 343, 379–380 [Assem. Bill 518 applies retroactively]; *People v. Sek* (2022) 74 Cal.App.5th 657, 673-674 [same].)

Here, defendant was sentenced to the upper term on counts 2, 4, 6 and 8; and count 4 of defendant's sentence was stayed pursuant to section 654 in light of count 1. Defendant's judgment is not yet final since his appeal was still pending when both Senate Bill 567 and Assembly Bill 518 became effective. It is undisputed that defendant is entitled to retroactive application of the ameliorative changes effected by Senate Bill 567 and Assembly Bill 518.

The former version of section 1170 stated that "[w]hen a judgment of imprisonment [w]as to be imposed and the statute specifie[d] three possible terms, the choice of the appropriate term ... rest[ed] within the sound discretion of the court." (§ 1170, former subd. (b).) This version gave the sentencing court broad discretion to decide which of the three terms of imprisonment to choose by weighing the aggravating and mitigating circumstances and choosing which term best served the interests of justice. (See *People v. Salazar* (2022) 80 Cal.App.5th 453, 462, review granted Oct. 12, 2022, S275788; *People v. Wandrey* (2022) 80 Cal.App.5th 962, 981, review granted Sept.

26.

28, 2022, S275942.) Senate Bill 567 amended section 1170, subdivision (b) by making the middle term the presumptive sentence for a term of imprisonment, unless certain circumstances exist. (*Dunn, supra*, 81 Cal.App.5th at p. 402.) Specifically, the middle term is now the maximum term of imprisonment that may be imposed unless there are circumstances in aggravation that justify imposition of a term exceeding the middle term, which must be admitted or proven true beyond a reasonable doubt. (§ 1170, subd. (b)(1), (2).) Retrospective application of these changes "means we must ask both whether we can be certain the jury would have found beyond a reasonable doubt the aggravating circumstances relied on by the court and whether the trial court would have exercised its discretion in the same way if it had been aware of the statutory presumption in favor of the middle term. (*People v. Lopez*[, *supra,*] 78 Cal.App.5th [at pp.] 463, 466–467, fns. 10 & 11 [].)" (*People v. Wandrey, supra,* 80 Cal.App.5th 982, review granted.)

First, we conclude the facts relied upon by the trial court in imposing the upper terms do not meet the new requirements under section 1170, subdivision (b). The trial court relied on four circumstances in aggravation in imposing the upper term: (1) defendant engaged in violent conduct, which indicates a serious danger to society, based on the current offenses, as well as his prior convictions; (2) defendant's prior convictions as an adult and sustained petitions in juvenile delinquency proceedings are numerous and increasing in seriousness; (3) defendant was on three grants of misdemeanor probation when the crime was committed; and (4) defendant's prior performance on juvenile and adult probation was unsatisfactory in that he violated terms and reoffended. The parties concede that these factors were not found true beyond a reasonable doubt by a factfinder, nor stipulated to by defendant, other than the 2011 misdemeanor conviction for criminal threats in support of the firearms possession charges in counts 5 and 6. (See § 1170, subd. (b).) Additionally, the record reveals the court adopted the sentencing justifications set forth in the probation report, and defendant's criminal history was not proven true by a certified record of conviction. (See § 1170, subd. (b).) As such, the sentence does not

comply with section 1170, subdivision (b), as amended. We next consider whether the error is harmless.

The Courts of Appeal are divided on the applicable standard for assessing prejudice in this situation, and the issue is currently pending before our Supreme Court. (See *People v. Lynch* (May 27, 2022, C094174) [nonpub. opn.], review granted Aug. 10, 2022, S274942.) In *People v. Flores* (2022) 75 Cal.App.5th 495 [nonpub. text], Division Three of the First District Court of Appeal concluded a remand for resentencing is unnecessary if the reviewing court can determine beyond a reasonable doubt that the jury would have found true at least one aggravating factor. (*Flores*, at pp. 500–501.) In *People v. Lopez, supra,* 78 Cal.App.5th 459 [nonpub. text], Division One of the Fourth District Court of Appeal concluded a remand is necessary unless the reviewing court can (1) determine beyond a reasonable doubt that the jury would have found true all the aggravating factors the trial court cited, or (2) conclude, "to the degree required by *People v. Watson*[, *supra,*] 46 Cal.2d [at p.] 836," that the trial court would have reached the same decision even if it knew it could not properly rely on all the factors it did. (*Lopez*, at p. 467, fn. 11).

In *Dunn*, a panel of this court concluded, since the type of error at issue has both federal Constitutional and state law dimensions, "the correct standard for harmless error lies between the standards articulated in *Flores* and *Lopez*." (*Dunn*, *supra*, 81 Cal.App.5th at pp. 408–409.) *Dunn* described the standard for assessing prejudice as follows: "The reviewing court determines (1)(a) beyond a reasonable doubt whether the jury would have found one aggravating circumstance true beyond a reasonable doubt and (1)(b) whether there is a reasonable probability that the jury would have found any remaining aggravating circumstance(s) true beyond a reasonable doubt. If all aggravating circumstances relied upon by the trial court would have been proved to the respective standards, any error was harmless. If not, the reviewing court moves to the second step of *Lopez,* (2) whether there is a reasonable probability that the trial court would have

28.

imposed a sentence other than the upper term in light of the aggravating circumstances provable from the record as determined in the prior steps. If the answer is no, the error was harmless. If the answer is yes, the reviewing court vacates the sentence and remands for resentencing ...." (*Dunn*, *supra*, at pp. 409–410, fn. omitted.)

We conclude here, however, no application of the harmless error test can be properly employed to preclude resentencing where the record does not clearly indicate it would have reached the same conclusion " 'even if it had been aware that it had such discretion.' " (See *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) " 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court.' " (*Ibid.*; see *United States v. Tucker* (1972) 404 U.S. 443, 447; *Townsend v. Burke* (1948) 334 U.S. 736, 741.) " 'A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' " (*Gutierrez*, *supra*, at p. 1391; *People v. Belmontes* (1983) 34 Cal.3d 335, 348, fn. 8.) "This means we must ask … whether the trial court would have exercised its discretion in the same way if it had been aware of the statutory presumption in favor of the middle term." (*People v. Wandrey, supra,* 80 Cal.App.5th at p. 982, review granted; *Lopez, supra,* 78 Cal.App.5th at pp. 466–467, fns. 10 & 11.) In such case, "the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*Gutierrez*, *supra*, at p. 1391; *Belmontes*, *supra*, at p. 348; see *People v. Rodriguez* (1998) 17 Cal.4th 253, 257.)

In *Gutierrez*, the California Supreme Court considered a retroactive change in the law expanding the trial court's sentencing discretion by eliminating the presumption in favor of life without the possibility of parole for 16 to 17 year old juveniles convicted of special circumstance murder. (*Gutierrez, supra,* 58 Cal.4th at p. 1391.) By eliminating the presumption, the change in the law expanded the trial court's discretion. (*Id.* at p.

29.

1382.)  The *Gutierrez* court concluded the records did not clearly indicate that the courts would have imposed the same sentence had they been aware of the full scope of their discretion and remanded the cases for resentencing.  (*Id*. at p. 1391.)

Similarly, Senate Bill 567 changed the trial court's discretion at sentencing. Rather than the previous broad discretion given to the trial courts in deciding which term to impose, the trial courts are now restricted to a presumption of the middle term. (§ 1170, subd. (b)(1); see *Dunn*, *supra*, 81 Cal.App.5th at p. 402.)  "[I]t is one thing to say that a court, confronting [three] permissible sentencing options, may impose the harsher sentence if it finds that sentence justified by the circumstances.  It is quite another to say that a court, bound by a presumption [not to exceed the middle term], must impose that sentence unless it finds good reasons not to do so.  When the choice between [three] sentences must be made by weighing intangible factors, a presumption in favor of one sentence can be decisive in many cases."  (*Gutierrez*, *supra*, 58 Cal.4th at p. 1382.) Therefore, since the law retroactively restricts the court's discretion from three potential sentences to a presumption in favor of one sentence, "concomitantly circumscrib[ing]" its discretion, the case requires resentencing unless the record clearly indicates the trial court would have imposed the upper term had it known of the new presumptive middle term. (See *Gutierrez*, *supra*, 58 Cal.4th at p. 1391, quoting *People v. Guinn* (1994) 28 Cal.App.4th 1130, 1142; accord, *People v. Flores* (2020) 9 Cal.5th 371, 431–432.)

Although the record shows the trial court found no mitigating circumstances and four aggravating circumstances, it is not clear the trial court would have imposed the upper term had it been faced with the new presumption not to exceed the middle term. (See § 1170, subd. (b)(1).)  The four circumstances in aggravation were noted by the trial court before imposing defendant's sentence but the record does not specifically link the aggravating circumstances to its decision to impose upper terms on counts 2, 4, 6 and 8.[4]

---

[4]    The four aggravating circumstances found by the trial court are: (1) defendant engaged in violent conduct, which indicates a serious danger to society, based on the

Therefore, we must remand the matter for resentencing for the court to exercise its discretion under the amended section 1170, subdivision (b). (See *Gutierrez*, *supra*, 58 Cal.4th at p. 1391.)

Assembly Bill 518 amended section 654, which no longer requires punishment under the longest possible term of imprisonment when multiple offenses are based on the same act or omission. Here, the jury convicted defendant of first degree murder in count 1, finding true that he personally and intentionally discharged a firearm, causing great bodily injury or death and finding true the special circumstance allegation that the murder was perpetrated by discharging a firearm from a motor vehicle with intent to inflict death under section 190.2, subdivision (a)(21). Section 1385.1 states, "Notwithstanding Section 1385 or any other provision of law, a judge shall not strike or dismiss any special circumstance which is admitted by a plea of guilty or nolo contendere or is found by a jury or court as provided in Sections 190.1 to 190.5, inclusive." Thus, the trial court has no authority or discretion to strike a special circumstance finding in order to reduce a defendant's punishment. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1078; *People v. Mora* (1995) 39 Cal.App.4th 607, 614–615.) Although defendant contends that this section does not expressly prohibit a "stay" of a sentence or identify section 654, we conclude "it is enough that the provision applies '[n]otwithstanding any other law.' " (See *People v. Garcia* (2022) 83 Cal.App.5th 240, 258, as modified on denial of reh'g (Oct. 10, 2022), review granted Jan. 11, 2023, S276858; c.f. *People v. Caparaz* (2022) 80 Cal.App.5th 669, 689 [no discretion to stay sentencing under amended § 654 where defendant was convicted of a One Strike offense].) Moreover, we note section 190.2, subdivision (a) mandates one of two possible sentences: death or life imprisonment

---

current offenses, as well as his prior convictions; (2) defendant's prior convictions as an adult and sustained petitions in juvenile delinquency proceedings are numerous and increasing in seriousness; (3) defendant was on three grants of misdemeanor probation when the crime was committed; and (4) defendant's prior performance on juvenile and adult probation was unsatisfactory in that he violated terms and reoffended.

without possibility of parole.  (See *Mora* at pp. 614–615.)  Staying the sentence on count 1 and ordering defendant to serve the sentence imposed on count 4 instead would result in a sentence other than death or life imprisonment without possibility of parole —in violation of section 190.2.  It would also have the same "practical" effect as striking the special circumstance finding—in violation of section 1385.1.  (See *Garcia, supra,* 83 Cal.App.5th at pp. 257–258.)  Therefore, we conclude resentencing pursuant to Assembly Bill 518 is not permitted.  (See *Garcia, supra,* at p. 243.)

## DISPOSITION

The matter is remanded for resentencing in light of Senate Bill 567. The judgment is otherwise affirmed.

FRANSON, Acting P. J.

WE CONCUR:

PEÑA, J.

MEEHAN, J.